STATE OF NORTH CAROLINA v. PHILIP MORRIS USA INC., F/K/A PHILIP MORRIS
INCORPORATED; R.J. REYNOLDS TOBACCO COMPANY, INDIVIDUALLY AND AS SUC-
CESSOR TO R.J. REYNOLDS TOBACCO COMPANY AND BROWN & WILLIAMSON
TOBACCO CORPORATION; AND LORILLARD TOBACCO COMPANY

No. 2PA05

(Filed 19 August 2005)

**Contracts; Taxation— Fair and Equitable Tobacco Reform Act
of 2004—tax offset adjustment**

The trial court erred by holding that enactment of the Fair
and Equitable Tobacco Reform Act of 2004 (FETRA) entitled
defendant tobacco companies to a tax offset adjustment for 2004
that relieved them of their obligations under the National
Tobacco Grower Settlement Trust for 2004, because: (1) the per-
tinent tax offset provision in Schedule A of the trust agreement
provides that a tax offset adjustment occurs when defendants
have actually paid a governmental obligation; (2) the agreement
authorizes a tax offset adjustment only once an assessment
against defendants is used to aid tobacco farmers, and tobacco
farmers received neither trust distributions nor FETRA payments
in calendar year 2004; (3) pages A-5 to A-6 of the trust do not
show that the parties intended a qualifying change of law to be
the sole prerequisite for a tax offset adjustment; (4) the annual
payment scheme of the trust indicates the parties' intent to limit
tax offset adjustments to years in which assessments are made,
and the U.S. Secretary of Agriculture made no FETRA assess-
ments during calendar year 2004; (5) there was no congressional
desire expressed in FETRA to give defendants a tax offset adjust-
ment for 2004, and Congress could have, but did not, signal such
intent by explicitly directing the Secretary of Agriculture to col-
lect the first FETRA assessment before 31 December 2004; (6)
the Secretary of Agriculture interpreted FETRA to mean that
Congress intended the first FETRA assessment to be due on 31
March 2005; and (7) defendants must actually assume the burden
of FETRA before being relieved of their obligations to the Phase
II trust.

Justice WAINWRIGHT did not participate in the consideration or
decision of this case.

On discretionary review pursuant to N.C.G.S. § 7A-31, prior to a
determination by the Court of Appeals, of an order and opinion

STATE v. PHILIP MORRIS USA, INC.

[359 N.C. 763 (2005)]

entered on 23 December 2004 by Judge Ben F. Tennille in Superior Court, Wake County. Heard in the Supreme Court 16 May 2005.

*Ellis & Winters LLP, by Richard W. Ellis and Thomas D. Blue, Jr., for petitioner-appellants JPMorgan Chase Bank, N.A., as Trustee, and the North Carolina Phase II Tobacco Certification Entity, Inc.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Jim W. Phillips, Jr., for respondent-appellees Philip Morris USA Inc., R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company; and Smith Moore LLP, by Larry B. Sitton, Gregory G. Holland, and Angela L. Little, for respondent-appellee Philip Morris USA Inc.*

*Shanahan Law Group, by Kieran J. Shanahan and Reef C. Ivey, II, for North Carolina Phase II Beneficiaries, amici curiae.[1]*

*H. Julian Philpott, Jr., General Counsel, and Stephen A. Woodson, Associate General Counsel, North Carolina Farm Bureau Federation, Inc., for North Carolina Farm Bureau Federation, Inc., American Farm Bureau Federation, Florida Farm Bureau Federation, Georgia Farm Bureau Federation, Kentucky Farm Bureau Federation, Maryland Farm Bureau, Inc., Missouri Farm Bureau Federation, Ohio Farm Bureau Federation, South Carolina Farm Bureau Federation, Virginia Farm Bureau Federation, Tennessee Farm Bureau Federation, and Indiana Farm Bureau Federation, amici curiae.*

NEWBY, Justice.

In this case we construe the language of the National Tobacco Grower Settlement Trust to determine whether enactment of the Fair and Equitable Tobacco Reform Act of 2004 relieved defendant tobacco companies of their obligations to the Trust for 2004. We hold it did not and reverse the trial court.

## I. BACKGROUND

In 1938 the federal government began implementing price supports and marketing quotas for U.S. tobacco in an effort to stabilize

---

1. This group consists of twenty-three named individuals, all of whom are North Carolina tobacco growers and members of the North Carolina Tobacco Growers Association, an advocacy group representing the interests of approximately 3000 tobacco growers and quota holders in this State.

**STATE v. PHILIP MORRIS USA, INC.**

[359 N.C. 763 (2005)]

the domestic tobacco market. Quotas limited production and confined the cultivation of tobacco to specific tracts of land. While the federal government adjusted quota levels annually based on tobacco companies' demand, federal price supports kept tobacco prices elevated. In recent years, tobacco quotas and price supports often worked at cross-purposes. Artificially high prices dampened demand for domestic tobacco and led to reduced quotas. Along with many other factors, this contributed to a worsening financial situation among the members of the tobacco farming community.

During the 1990s, all fifty states and six other American jurisdictions filed suit against defendant tobacco companies ("Settlors") to recover healthcare costs associated with smoking-related illnesses. On 16 November 1998, forty-six states, the District of Columbia, the Commonwealth of Puerto Rico, and four other American territories agreed to settle their claims. The resultant Master Settlement Agreement ("MSA") was the object of consent decrees and final judgments in each complaining jurisdiction.[2] Settlors immediately raised prices to cover the future costs of payments due under the MSA.

The parties anticipated this rise in prices would curtail tobacco consumption; indeed, reduced consumption was one of the aims of the MSA.[3] They also understood decreased demand for tobacco products could cause tobacco growers and quota holders ("tobacco farmers") significant economic hardship.[4] The MSA therefore required that Settlors meet with the political leadership of the fourteen tobacco growing states ("Grower States") to devise a plan for mitigating the MSA's potentially negative economic consequences.[5] These meetings produced the National Tobacco Grower Settlement Trust ("the Phase II Trust" or "the Trust"). By agreeing to the Phase II Trust, Settlors pledged to spend approximately $5.15 billion on economic assistance to tobacco farmers in Grower States.

---

2. The other four states, Florida, Minnesota, Mississippi, and Texas, concluded separate settlement agreements with Settlors before execution of the MSA, although Florida is part of the National Tobacco Settlement Trust because of its status as a Grower State.

3. The MSA also required Settlors to fund and conduct anti-smoking campaigns designed to reduce and discourage smoking by youth, further reducing tobacco consumption.

4. There are approximately 80,000 tobacco growers and over 300,000 tobacco quota holders.

5. The Grower States are Alabama, Florida, Georgia, Indiana, Kentucky, Maryland, Missouri, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.

Despite its cost, the Trust appealed to Settlors for financial reasons. Funding the Trust satisfied the requirement of the MSA "to address the economic concerns of the Grower States." In other words, Settlors agreed to the Trust because doing so was a condition of the settlement that had relieved them of potentially bankrupting liability for smoking-related healthcare costs.[6] Additionally, the Trust shields Settlors from claims the Grower States might otherwise bring for economic damages suffered as a result of the MSA. National Tobacco Grower Settlement Trust at ¶4.05 (July 19, 1999) [hereinafter Trust Agreement] ("The Grower States confirm that the releases they have given to the Settlors cover, and thus bar, any claims for damages allegedly incurred by the Grower States as a result of adverse economic consequences suffered by the tobacco grower communities in the respective Grower States.").[7]

The preamble announces the purpose of the Trust: "[T]o provide aid to Tobacco Growers and Tobacco Quota Owners and thereby to ameliorate potential adverse economic consequences to the Grower States." The Trust accomplishes this objective through annual distributions to the beneficiaries. *Id.* at ¶1.02. These distributions supplement the declining incomes of tobacco farmers as they adapt to an economy in which the MSA has dulled the appetite for tobacco.

The Phase II Trust operates on a calendar year basis. Settlors fund the Trust through "Annual Payment[s]" divided into four equal installments due on March 31, June 30, September 30 and December 15, respectively.[8] *Id.* at A-1 to A-2. An Independent Accountant chosen by the Settlors sets the amount of each Annual Payment by March 1 of each year. *Id.* at A-14 to A-15. Certification entities in each of the Grower States communicate annually to the Trustee the names and addresses of tobacco farmers who qualify to participate in the Trust. *Id.* at ¶1.02. Distributions to eligible tobacco farmers take place once

---

6. "Each Settlor has entered into this Trust Agreement solely to satisfy the Grower State Obligation." Trust Agreement at ¶4.03. Under the Trust, a Grower State must show it has achieved "State-Specific Finality" before its tobacco farmers may receive distributions from the Phase II Trust. *Id.* at ¶1.02. The MSA defines State-Specific Finality as the end of legal proceedings against Settlors and a dismissal with prejudice of the state's claims. Master Settlement Agreement at 11-12.

7. Quite understandably, Settlors also negotiated with an eye toward potential tax deductions. *See* Trust Agreement at ¶4.06 ("The Trust . . . is intended . . . to be a qualified settlement fund for federal tax purposes as described in Treas. Reg. § 1.468B-1. The Trustee shall comply with all requirements applicable to qualified settlement funds . . . [and] any comparable provisions of state or local tax laws[.])"

8. The portion of the assessment for which a particular Settlor is liable depends upon that Settlor's "Relative Market Share" of cigarettes. *Id.* at A-3.

each year by December 31. *Id.* The Trustee ordinarily disburses all funds it has received during the calendar year, and, once disbursed, funds may not be recovered. *Id.*

Schedule A of the Trust Agreement establishes the formulae used to calculate Settlors' Annual Payments. Simply put, the assessment for a given calendar year is determined by taking the specified base payment for that year and applying certain adjustments.[9] Trust Agreement at A-1 to A-16. These include an "Inflation Adjustment," which increases the base payment in response to changes in the Consumer Price Index during the previous calendar year, and a "Volume Adjustment," which either increases or decreases the base payment depending on the number of cigarettes shipped during the preceding calendar year. *Id.* at A-4 to A-5.

Another adjustment to Annual Payments is the Tax Offset Adjustment. The parties drafted the Trust Agreement knowing federal and state governments might take additional measures to aid tobacco farmers. They realized such measures would probably entail additional assessments against Settlors. The Tax Offset Adjustment entitles Settlors to reduce their Annual Payment in response to the imposition of a "Governmental Obligation," which is a new or increased cigarette tax used in whole or in part for the benefit of tobacco farmers.[10] Trust Agreement at A-5 to A-8. Schedule A defines Governmental Obligation broadly enough to encompass everything from an individual state's excise taxes on cigarettes to the massive assessments necessary to fund a federal tobacco buyout. *Id.*

---

9. Schedule A establishes the following base payments for calendar years 1999 to 2010.

    1999—$380,000,000
    2000—$280,000,000
    2001—$400,000,000
    2002—$500,000,000
    2003—$500,000,000
    2004—$500,000,000
    2005—$500,000,000
    2006—$500,000,000
    2007—$500,000,000
    2008—$500,000,000
    2009—$295,000,000
    2010—$295,000,000

10. The Tax Offset Adjustment for any given year is calculated by multiplying the amount of Governmental Obligation paid times the ratio of the Grower Governmental Obligation (the amount of Governmental Obligation used to benefit tobacco farmers) divided by the amount of the Governmental Obligation. *Id.* at A-5 to A-7.

STATE v. PHILIP MORRIS USA, INC.

[359 N.C. 763 (2005)]

Likewise, a Governmental Obligation includes the cost to Settlors of complying with laws or regulations that require them to purchase minimum quantities or percentages of domestic tobacco. Trust Agreement at A-8 to A-9. Whereas the Inflation and Volume Adjustments are allocated evenly across quarterly installments, the Tax Offset Adjustment may be "allocated in full to the first payment due after the Adjustment is applied (and to subsequent payments as necessary to ensure full credit)." *Id.* at A-1.

From 1999 to 2003, the Phase II Trust functioned without significant controversy. Settlors paid their quarterly installments, and the Trustee made annual distributions to tobacco farmers. In 2003, however, the parties disagreed over whether a tobacco buyout bill pending in the United States Senate (the Tobacco Market Transition Act of 2003) constituted a Governmental Obligation. Some Settlors withheld their payments to the Phase II Trust arguing the proposed legislation would earn them a Tax Offset Adjustment for 2003. The Trustee moved for specific performance. During the ensuing mediation, the Trustee and Settlors negotiated Amendment One to the Trust Agreement. National Tobacco Grower Settlement Trust Agreement Amendment Number One (effective Mar. 30, 2004) [hereinafter Amendment One].

Amendment One prohibits Settlors from claiming a Tax Offset Adjustment "based upon proposed changes in laws." Amendment One at 2. It also refines the rules regarding refunds of Trust assets to Settlors. Arguably, prior to Amendment One such refunds were not permitted. Trust Agreement at 4.15. Settlors could apply Tax Offset Adjustments to future payments only. Under Amendment One, Settlors may receive refunds of quarterly payments during the calendar year in which a Tax Offset Adjustment "first became effective," but only to the extent the adjustment exceeds their remaining obligations to the Trust.[11] Significantly, the amendment stipulates it cannot be considered when determining when a Tax Offset Adjustment occurs:

11. Refunds are available only prior to distribution. Trust funds may not be recovered once disbursed to tobacco farmers.

The refund provision of Amendment One sets forth the following instructions for calculating whether a refund is due Settlors:

A Settlor that has become entitled to a Tax Offset Adjustment under this Schedule A by reason of a Governmental Obligation shall make reasonable estimates of (x) the aggregate amount of Tax Offset Adjustments attributable to that Governmental Obligation to which it expects to become entitled from the year in which the Tax Offset Adjustment is first effective through 2010, (y) the Settlor's share of the remaining Annual Payment to be made in the year in which the Tax

**STATE v. PHILIP MORRIS USA, INC.**

[359 N.C. 763 (2005)]

No Resolution of Tax Offset Adjustment Effective Date Dispute: The Settlors and the Trustee have different interpretations of the language in the original Agreement concerning the date on or from which any Settlor shall be entitled to a reduction arising from a Tax Offset Adjustment. It is agreed and acknowledged that Amendment Number One does not address or resolve this issue, *and nothing in Amendment Number One shall be used or construed to have any bearing on the resolution of such issue.*

Amendment One at 4 (emphasis added).

Problems with the tobacco industry prompted members of Congress to introduce more than twenty tobacco buyout bills from 1997 through 2004. The parties to the Phase II Trust understood they had much to gain from legislation ending quotas and price controls. The Grower States recognized a federal buyout program would almost certainly offer larger payments to tobacco farmers than those available under the Trust. Settlors believed the price of U.S. tobacco leaf would drop precipitously once the tobacco market became a free market.

Finally, on 22 October 2004, President Bush signed the Fair and Equitable Tobacco Reform Act. America Jobs Creation Act of 200, Pub. L. No. 108-357, §§ 601-643, —— Stat. —— (2004) [hereinafter FETRA]. The Act terminated the price control/quota system for U.S. tobacco beginning with the 2005 tobacco crop. As the parties had anticipated, FETRA affords "enormous benefits" to both sides. *State v. Philip Morris USA Inc.*, 2004 WL 2966013, at \*9 (Wake County Super.Ct. Dec. 23, 2004) (No. 98-CVS-14377) (Tennille, J.). FETRA payments to tobacco farmers between 2005 and 2014 will approach $9.6 billion. And Settlors stand to profit handsomely from the abolition of market controls and a concomitant drop in tobacco prices. *See id.* at \*9 n.14 ("The cost of leaf is the largest single cost of production. By obtaining a free market the Tobacco Companies obtain the opportunity to control the largest component of produc-

---

Offset Adjustment first becomes effective, and (z) the Settlor's share of all remaining Annual Payments for all years subsequent to the year in which the Tax Offset Adjustment first becomes effective. If the Settlor reasonably estimates that clause (x) . . . exceeds the sum of clauses (y) and (z), then such Settlor shall be entitled to a refund, up to the amount of that excess, of its share of the Annual Payment it made during the calendar year in which the Tax Offset Adjustment first became effective . . . .

Amendment One at 2-3.

tion cost, thus permitting them to hold down price increases or reduce wholesale prices.")

FETRA directs the U.S. Secretary of Agriculture to offer tobacco farmers annual payments during each of fiscal years 2005 through 2014 in exchange for ending marketing quotas and related price supports. FETRA §§ 622 to 623. Tobacco farmers who wish to receive FETRA payments must enter into contracts with the Secretary to that effect. *Id.* Quarterly assessments against tobacco manufacturers and importers provide the necessary funding for payments. The confusing manner in which FETRA's provisions alternate between calendar and fiscal years makes it difficult to discern precisely when the first FETRA assessments were to occur. Section 625(b)(1) instructs the Secretary to "impose quarterly assessments during each of fiscal years 2005 through 2014." But section 625(d)(3)(A) specifies: "Assessments shall be collected at the end of each calendar year quarter." Section 625(b)(2) further muddles things with its requirement that "assessment payments over each four-calendar quarter period shall be sufficient to cover [] the contract payments made during that period." Regardless of when FETRA assessments should have commenced, Settlors expect to spend some $8 billion on FETRA between 2005 and 2014, $5.1 billion of which will come due by 2010. In contrast, their remaining obligation to the Phase II Trust for 2005 to 2010 would have totaled approximately $2.4 billion.

By the date of FETRA's enactment, Settlors had paid three of their four installments to the Trust for 2004, a total of $318 million. Their fourth installment was estimated at $106 million. Settlors' immediate response to FETRA was to claim a Tax Offset Adjustment and withhold their fourth installment. Settlors asserted their first FETRA assessment would come due before 31 December 2004 and would exceed their 2004 obligation to the Trust. According to them, the Trust Agreement entitled Settlors to a refund of the amount they had already paid during calendar year 2004 and relieved them of their last quarterly installment. The Trustee once again moved for specific performance.

On 23 December 2004, the trial court issued an opinion and order ruling in Settlors' favor. It identified the dispositive issue as follows:

Does the Trust Agreement provide that the Tobacco Companies' obligations to fund the Phase II Trust cease upon passage of buyout legislation that creates a financial obligation greater than the remaining financial obligation under the Phase II Trust, or

does the obligation to fund the Phase II Trust continue until there is an actual payment by the Tobacco Companies under the buy-out program?

2004 WL 2966013 at *24.[12]

The court held the Trust Agreement does not make Tax Offset Adjustments contingent upon actual payment of a Governmental Obligation. *Id.* at *25-26. Instead, the court read pages A-5 to A-6 of Schedule A to say that a "change in [] law" which imposes future financial obligations on Settlors for tobacco farmers' benefit is sufficient to trigger a Tax Offset Adjustment. *Id.* It concluded a qualifying change of law took place on 22 October 2004, the date of FETRA's enactment. 2004 WL 2966013 at *26-27.

Next the court addressed whether the Tax Offset Adjustment for FETRA should be applied to Settlors' 2004 Phase II Annual Payment. Concluding that FETRA had imposed Governmental Obligations on Settlors for 2004, the court held the 2004 Annual Payment was subject to adjustment. *Id.* at *27. The Governmental Obligations in question consisted of "an assessment period which includes the last quarter of calendar year 2004 [and assessments during] fiscal years 2005 and 2006 . . . based upon cigarettes manufactured in calendar year 2004." *Id.* Moreover, the trial court construed FETRA as authorizing the Secretary of Agriculture to impose *and require payment* of the initial FETRA assessment in December 2004. 2004 WL 2966013 at *13.

Having held that Settlors rated a Tax Offset Adjustment for 2004, the trial court proceeded to apply it. According to the court, "the amount of Tax Offsets available . . . for cigarettes manufactured in 2004 exceeds $106 million, the amount due by Settlors under the Phase II Trust for the fourth quarter of calendar year 2004. Therefore no payment is due for the December quarter." *Id.* at *27. The court further determined the $5.1 billion Settlors expected to pay in FETRA assessments between 2005 to 2010 "exceed[ed] the combination of $106 million and $2.4 billion owed for the balance of 2004 and the remainder of the life of the Trust." *Id.* Given those findings, it concluded Amendment One entitled Settlors "to a refund of the amounts previously paid for 2004." *Id.*

The perception that Congress intended FETRA to spare Settlors their 2004 Annual Payment heavily influenced the trial court's

---

12. The Trust Agreement vests the Superior Court of Wake County with jurisdiction over disputes arising from the Phase II Trust. Trust Agreement at ¶¶4.14-4.15.

decision. Said the court: "It is abundantly clear that Congress was keenly aware of the impact of FETRA on the Phase II payments." 2004 WL 2966013 at *12. The court scanned a meager legislative record for hints of congressional design. A conference committee report provided evidence that FETRA became effective on the date of its enactment in 2004. *Id.* at *11. In the court's opinion, this report demonstrated the Act was meant to be a "change in [] law" within the meaning of the Trust Agreement. *Id.* at *26-27. The fact that FETRA seemed to impose an assessment for the last calendar quarter of 2004 cinched the matter. *Id.* at *13 ("The Court believes that Congress provided the Tobacco Companies with the opportunity to avoid the 2004 Trust payment by (1) making the effective date of FETRA 2004 and (2) providing that the Tobacco Companies would be assessed for the fourth calendar quarter of 2004.")

The trial court acknowledged its decision would leave tobacco farmers with neither a Trust distribution nor a FETRA payment for 2004. *Id.* at *23. Conceding this " 'gap' in the receipt of money" would "cause some temporary hardship[,]" the court reasoned the delay between Phase II checks and FETRA payments "shouldn't be long, and . . . should be worth the wait." *Id.* It pointed out Congress could have avoided the problem "by passing FETRA earlier in the year" and urged the Secretary of Agriculture to ameliorate the impact of its decision "by swift completion of the contracting process." 2004 WL 2966013 at *29.

We allowed the petition filed by the Trustee and Certification Entities for discretionary review before determination by the Court of Appeals.[13]

## II. ANALYSIS

We note at the outset several points upon which the parties agree. The U.S. Secretary of Agriculture made no FETRA assessments during calendar year 2004. Subsequent regulations from the Department of Agriculture established FETRA assessments would begin on 31 March 2005. Tobacco Transition Assessments, 70 Fed. Reg. 7007, 7009, 7012 (Feb. 10, 2005) (to be codified at 7 C.F.R. pt. 1463). Tobacco farmers received neither Trust distributions nor FETRA payments in calendar year 2004.

The parties likewise agree this case obliges this Court to interpret the terms of the Phase II Trust in order to discern whether FETRA's

---

13. For brevity's sake, this opinion will refer to petitioners as "the Trustee."

enactment on 22 October 2004 triggered a Tax Offset Adjustment for calendar year 2004 notwithstanding the lack of assessments in 2004. The trial court detailed with admirable lucidity the complex economic and historical factors resulting in the creation of the Phase II Trust. At bottom, however, this case is one of contract interpretation, and we review the trial court's conclusions of law *de novo. See Register v. White,* 358 N.C. 691, 693, 599 S.E.2d 549, 552 (2004).

Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution. *Lane v. Scarborough,* 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh,* 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) ("A consent judgment is a court-approved contract subject to the rules of contract interpretation."). Intent is derived not from a particular contractual term but from the contract as a whole. *Jones v. Casstevens,* 222 N.C. 411, 413-14, 23 S.E.2d 303, 305 (1942) (" 'Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole.' ") (citation omitted).[14]

Consistent with the aforesaid principles, we must carefully inspect the provisions of the Phase II Trust to ascertain the parties' intention at the time it was executed. Before proceeding, we pause to observe that Amendment One has no effect on our inquiry. Amendment One at 4. ("[N]othing in Amendment Number One shall be used or construed to have any bearing on the resolution of [when a Tax Offset Adjustment is warranted].").

At issue is the meaning of the Tax Offset Adjustment provision in Schedule A of the Trust Agreement. Specifically, the dispute centers on the following language from pages A-5 to A-7:

(A-5) Tax Offset Adjustment. Except as expressly provided below, the amounts to be paid by the Settlors in each of the years 1999 through and including 2010 shall also be reduced upon the occurrence of any change in a law or regulation or other govern-

---

14. Another "fundamental" rule of contract interpretation is that a written contract is construed against the party who drafted it. *See, e.g., Chavis v. S. Life Ins. Co.,* 318 N.C. 259, 262, 347 S.E.2d 425, 427 (1986). In this case, the Trust Agreement expressly states that neither party shall be considered the drafter, making the rule inapplicable.

mental provision that leads to a new, or an increase in an existing, federal or state excise tax on Cigarettes, or any other tax, fee, assessment, or financial obligation of any kind . . .

(A-6) imposed on the purchase of tobacco or any tobacco products or on production of Cigarettes or use of tobacco in the manufacture of Cigarettes at any stage of production or distribution or that is imposed on the Settlors, to the extent that all or any portion of such Governmental Obligation is used to provide:

(i)    direct payments to [tobacco farmers];

(ii)   direct or indirect payments, grants or loans under any program designed in whole or in part for the benefit of [tobacco farmers];

(iii)  payments, grants or loans to Grower States to administer programs designed in whole or in part to benefit [tobacco farmers]; or

(iv)   payments, grants or loans to any individual, organization, or Grower State for use in activities which are designed in whole or in part to obtain commitments from, or provide compensation to [tobacco farmers] to eliminate tobacco production.

The amount of the Governmental Obligation used for any of the purposes set forth above shall be the "Grower Governmental Obligation."

(A-7) In the event of such a Governmental Obligation, the amount otherwise required to be paid by each Settlor each year (after taking account of all adjustments or reductions hereunder) shall be reduced by an amount equal to the product of the amount of such Governmental Obligation paid in connection with Cigarettes manufactured by the Settlor (or tobacco or tobacco products used by the Settlor to manufacture Cigarettes) for the same year multiplied by the ratio of the Grower Governmental Obligation divided by the amount of the Governmental Obligation, which reduction amount may be carried forward to subsequent years as necessary to ensure full credit to the Settlor. If the Governmental Obligation results from a law or regulation or other governmental provision adopted by a Grower State, or by a political subdivision within such Grower State, the amount that a Settlor may reduce its payment to the Trust in any one year

shall not exceed the product of the amount the Settlor otherwise would have paid to the Trust in that year in the absence of the Tax Offset Adjustment multiplied by the allocation percentage for the pertinent Grower State set forth in Section 1.03. The Settlor may reduce its annual payment by a reasonable estimate of any such reduction and adjust its payment after the actual amount is finally determined.

The parties propose alternative ways of reading this provision. Settlors maintain the initial language on pages A-5 to A-6 establishes when a Tax Offset Adjustment occurs; they consider page A-7 merely an explanation of the method employed to calculate the adjustment. Settlors contend a change in law imposing a financial obligation on them for tobacco farmers' benefit triggers a Tax Offset Adjustment, regardless of when the obligation is actually paid. The trial court adopted this view.

The Trustee asserts pages A-5 to A-6 define the terms "Governmental Obligation" and "Grower Governmental Obligation," while page A-7 controls when and how a Tax Offset Adjustment applies. The Trustee argues the Tax Offset Adjustment provision requires a "cascade of events" before an adjustment is warranted and that these events include 1) a change in the law leading to an assessment against Settlors, 2) payment of the assessment by Settlors, and 3) the use of the assessment to aid tobacco farmers.

As noted above, we look first to the plain language of the Tax Offset Adjustment provision to discern the intent of the parties. Settlors concede the Trust Agreement is a "detailed and precisely drafted instrument reflecting the agreement reached in 1999 by the [parties,]" and they consider the Tax Offset Adjustment provision "[t]he most detailed provision in Schedule A." Given the degree of lawyerly scrutiny each word of the Trust Agreement doubtless underwent, we are not inclined to interpret the terms of Schedule A in a fashion that deviates from the meaning commonly ascribed to them.

We believe the Trustee's proposed construction accords with the ordinary meaning of the terms of the Trust Agreement. A closer look at the language on page A-7 of Schedule A confirms this.

In the event of such a Governmental Obligation, the amount otherwise required *to be paid* by each Settlor *each year* . . . shall be reduced by an amount equal to the product of the amount

of such Governmental Obligation *paid* in connection with Cigarettes manufactured by the Settlor . . . *for the same year* multiplied by the ratio of the Grower Governmental Obligation, which reduction amount may be carried forward to subsequent years as necessary to ensure full credit to the Settlor.

(Emphasis added.)

We construe this language to mean a Tax Offset Adjustment occurs when Settlors have actually paid a Governmental Obligation. The parties' inclusion of "to be paid" in the same sentence as "paid" illustrates their ability to navigate the nuances of language. If the parties had not intended to make payment of a Governmental Obligation a prerequisite for a Tax Offset Adjustment, they could have readily declared this intention by replacing "paid" with "to be paid" or similar wording. Their deliberate selection of "paid" demonstrates their desire to allow Tax Offset Adjustments only during calendar years in which Governmental Obligations have actually been satisfied.

Settlors argue the inclusion of the phrase "in connection with Cigarettes manufactured by the Settlor" after "paid" and before "for the same year" suggests "paid" was not intended as a temporal precondition for a Tax Offset Adjustment. The trial court agreed. 2004 WL 2966013 at *26 (Th[e] phrase ["in connection with"] indicates that the reference is to the obligation, not a temporal precondition.")[15] Since FETRA's initial assessment relies on cigarette manufacturing data from 2004 (was imposed "in connection with" cigarettes manufactured in 2004), Settlors contend the Act entitled them to a Tax Offset Adjustment for 2004.

We disagree. It appears to us that "in connection with Cigarettes manufactured by the Settlor" represents the parties' wish to limit those payments that may serve as the basis for a Tax Offset Adjustment. The phrase was inserted to ensure Settlors do not receive offsets for assessments not directly tied to cigarette production. In other words, "for the same year" and "in connection with" both modify "paid;" the former indicates when an obligation must be satisfied, while the latter describes the obligation itself.

---

15. It seems to us the language on page A-7 is a temporal precondition of some sort. The Trustee makes payment of a Governmental Obligation the condition precedent for a Tax Offset Adjustment. The trial court requires a financial obligation for cigarettes manufactured during the year in which the Tax Offset Adjustment is claimed. Thus, under the trial court's interpretation, had the first FETRA assessment been based on 2005 cigarette manufacturing data, Settlors would not have rated a Tax Offset Adjustment for 2004.

Having adopted Settlors' approach, the trial court focused on the initial portion of the Tax Offset Adjustment provision.

> Except as expressly provided below, the amounts to be paid by the Settlors in each of the years 1999 through and including 2010 shall . . . be reduced *upon the occurrence of any change in a law . . . that leads to a new . . . financial obligation* of any kind . . . *imposed by any governmental authority* ("Governmental Obligation") that is *based on . . . Cigarettes . . .* or *that is imposed on the Settlors, to the extent that all or any portion of such Governmental Obligation is used* [to benefit tobacco farmers].

Trust Agreement at A-5 to A-6 (emphasis added).

Relying on this language, the court accepted Settlors' claim that a Tax Offset Adjustment is triggered whenever a change in law includes a financial obligation on Settlors earmarked to aid tobacco farmers. The qualifying change of law is itself the condition precedent to an offset.

This interpretation does not give full effect to the ordinary meaning of several words in the passage. As written, pages A-5 to A-6 seem to authorize a Tax Offset Adjustment only ·once an assessment against Settlors "is used" to aid tobacco farmers. *See also* Trust Agreement at A-6 (defining Grower Governmental Obligation as the "amount of the Governmental Obligation used [to benefit tobacco farmers]"). Had the parties intended a qualifying change of law to be the only triggering event for a Tax Offset Adjustment, they could have easily indicated this by substituting "will lead to" for "leads to" and "will be used" for "is used."

Furthermore, we very much doubt the trial court's construction of the wording on pages A-5 to A-6 reflects the original understanding of the parties. The court would allow a Tax Offset Adjustment even if the government never collects the assessments due under a qualifying change of law and hence never spends them for the benefit of tobacco farmers. Under those circumstances, tobacco farmers would receive reduced distributions (or no distributions) from the Phase II Trust and nothing from the government. The negative financial implications of this scenario for tobacco farmers are obvious. In short, pages A-5 to A-6 do not persuade us the parties intended a qualifying change of law to be the sole prerequisite for a Tax Offset Adjustment.

The trial court relied partly on the "Reasonable Estimate" provision found on page A-7 of the Trust Agreement when it held in Settlors' favor:

The Settlor may reduce its annual payment by a reasonable estimate of [a] reduction [for an expected Tax Offset Adjustment] and adjust its payment after the actual amount is finally determined.

We do not read this sentence to authorize Tax Offset Adjustments during years in which Governmental Obligations are not actually paid. Rather, we believe it indicates the parties' awareness that a Governmental Obligation could come due in a given year after Settlors had already made one or more of their quarterly payments. The Reasonable Estimate provision would allow Settlors to allocate an anticipated Tax Offset Adjustment across remaining quarterly payments even though the Governmental Obligation would not be paid until sometime later in the calendar year. This flexibility was particularly important before Amendment One, when refunds to Settlors were prohibited even in cases of overpayment.

Our interpretation of the Tax Offset Adjustment provision is confirmed when considered—as it must be—in the context of the entire Trust Agreement. See Jones, 222 N.C. at 413-14, 23 S.E.2d at 305. To begin with, permitting Tax Offset Adjustments absent the actual payment of a Governmental Obligation seems at odds with other language in Schedule A. At the beginning of Schedule A, the parties agreed that "[a] Tax Offset Adjustment . . . may be allocated in full to the first payment due after the Adjustment is applied (and to subsequent payments as necessary to ensure full credit)." Trust Agreement at A-1. We fail to see how a Tax Offset Adjustment can be applied "in full" before the exact amount of the Governmental Obligation is known. Such knowledge comes only from receipt of an actual bill for payment. That Settlors received no FETRA assessments last year suggests they did not rate a Tax Offset Adjustment for their final 2004 payment.

Moreover, the annual payment scheme of the Trust indicates the parties' intent to limit Tax Offset Adjustments to years in which assessments are made. We have already noted that Settlors make their Annual Payment to the Trust in quarterly installments. Under Schedule A, the Independent Accountant calculates the amount of each quarterly installment and communicates this information to Settlors at least thirty days prior to the due-date. Trust Agreement at

A-14. The Independent Accountant's statement must include estimates of any remaining quarterly payments for the year. *Id.* It is only with the fourth and final installment that Settlors' liability for the calendar year is definitively established. *See* Trust Agreement at A-15. Permitting Tax Offset Adjustments when assessments have not been levied would render it impossible to do more than estimate Settlors' annual obligation to the Phase II Trust.

The annual accounting requirements of the Trust Agreement also favor demanding actual assessments before Settlors may claim Tax Offset Adjustments. Paragraph 2.09 directs the Trustee to prepare an annual account of its transactions. The "Trust account" comprises, *inter alia*, a record of funds received and distributed and the amount of Settlors' payments during the period. *Id.* Paragraph 2.10 obliges the Trustee to submit its accounts and the Trust's books to an annual independent audit. Allowing Tax Offset Adjustments during years in which no assessments occur undermines this regime because it prevents the Trustee or the Independent Accountant from being able to determine precisely what the amount of Settlors' Annual Payments should have been.

Certainly the most compelling reason for rejecting the trial court's holding is that, taken to its logical extreme, it could defeat the express purpose of the Phase II Trust. As previously explained, the Trust was crafted to protect tobacco farmers from economic harm caused by the MSA. The Trust achieved this goal through annual distributions to the beneficiaries. These distributions were scheduled to furnish tobacco farmers a steady stream of supplemental income until at least 2010.

The trial court would give Settlors a Tax Offset Adjustment for 2004 regardless of when FETRA assessments are actually paid. Thus, had FETRA assessments been delayed until 2010, tobacco farmers would have been forced to endure the adverse economic consequences of the MSA for six years without the regular financial support the Phase II Trust was designed to supply. The court admitted this outcome was possible under its construction of the Trust Agreement but remained unmoved. 2004 WL 2966013 at *25 ("[The Trustee and Certification Entities] argue it would not be fair to interpret the agreement in such a way that a statute which did not require any payment under a buyout for years would relieve the Tobacco Companies of their current annual payment obligations under the Trust. Obviously they are correct.") Instead, the court emphasized "it is equally true that the agreement should not be in-

terpreted in a way that would require annual payments through the end of the trust period even though Congress passed buyout legislation now requiring a payout larger than the Trust obligations commencing in 2011." *Id.*

Of course, Settlors entered into the Trust Agreement knowing a tobacco buyout program might not materialize until long after their obligation to the Trust had been discharged. (As the trial court pointed out, seven years of failed buyout proposals preceded FETRA. 2004 WL 2966013 at *9.) Settlors apparently decided the legal protections of the MSA and the Trust Agreement outweighed the risk of having to fund both the Trust and a buyout program in succession. On the other hand, the Grower States entered into the Trust Agreement to obtain a regular source of supplemental income for tobacco farmers hurt by the economic repercussions of the MSA. Interpreting the Trust Agreement in a manner that could leave those individuals without this extra income for years runs squarely counter to the express purpose of the Trust.

Finally, we note the trial court's admirable attempt to discern legislative intent from the scant legislative record. We cannot agree, however, with its conclusion. The court held that Congress made FETRA effective in 2004 to save Settlors from their 2004 Phase II Annual Payment. Good reason exists to doubt this conclusion. First, the court assumed Congress construed the Tax Offset Adjustment provision in the same way as the court, that is, the mere enactment of a law imposing some future obligation tied to 2004 cigarette manufacturing would be sufficient to trigger a Tax Offset Adjustment for 2004. Given our holding, we do not think Congress necessarily viewed the provision in such a light.

Second, it is not at all apparent that Congress intended FETRA to become effective upon enactment. Generally, a law takes effect on the date of its enactment "absent [] clear direction by Congress to the contrary." *Gozlon-Peretz v. United States*, 498 U.S. 395, 404, 112 L. Ed. 2d 919, 930 (1991). Yet Congress went to the trouble of inserting an "Effective Date" section in FETRA. Section 643 of the Act states: "This title and the amendments made by this title shall apply to the 2005 and subsequent crops of each kind of tobacco." One could plausibly argue section 643 was drafted to prevent a Tax Offset Adjustment in 2004. True, the FETRA conference report stipulates that "the conference agreement is effective on the date of enactment." H.R. Rep. No. 108-755, at 218 (2004) (Conf. Rep.). The best evi-

**STATE v. PHILIP MORRIS USA, INC.**

[359 N.C. 763 (2005)]

dence of legislative intent is not conference reports, however, but statutes. *United States v. Gonzales*, 520 U.S. 1, 4, 137 L. Ed. 2d 132, 138 (1997) (noting judicial analysis of a statute always begins with "the statutory text"); *Knicklebine v. Pensacola*, 1988 U.S. Dist. LEXIS 18473 ("The most persuasive indicator of legislative intent, and the place of first resort, is the language of the statute.") On balance, we do not perceive in FETRA a congressional desire to give Settlors a Tax Offset Adjustment for 2004. Had it wished, Congress could have signaled such intent by explicitly directing the Secretary of Agriculture to collect the first FETRA assessment before 31 December 2004. It chose not to do so.

Recent federal regulations suggest the Secretary disagrees at least partially with the trial court's construction of FETRA. The trial court reasoned the Secretary could require payment of the initial FETRA assessment in December 2004, in which case "Amendment One . . . would control." 2004 WL 2966013 at *13. The U.S. Department of Agriculture's final rule on Tobacco Transition Assessments interprets FETRA's "contradictory" provisions to mean Congress intended the first FETRA assessment to be due on 31 March 2005. Tobacco Transition Assessments, 70 Fed. Reg. at 7009. A close reading of sections 625(b)(1) and 625(d)(3)(A) of the Act supports the Secretary's interpretation. Section 625(b)(1) calls for the imposition of quarterly assessments during fiscal years 2005 to 2014, but section 625(d)(3)(A) unambiguously directs collection of those assessments at the end of each calendar year quarter. Assuming the Secretary is correct, it is even less likely FETRA was a "change in[] law" for 2004 within the meaning of Schedule A.

The trial court was assuredly correct when it concluded the Tax Offset Adjustment provision was written to keep Settlors from having to fund two payment streams to the same tobacco farmers at the same time. Our decision does nothing to thwart this intent. Rather, we hold that Settlors must actually assume the burden of FETRA before being relieved of their obligations to the Phase II Trust. In so doing, we adhere to the plain language of the Tax Offset Adjustment provision and the express purpose of the Trust.

### III. DISPOSITION

The trial court erroneously held the enactment of FETRA entitled Settlors to a Tax Offset Adjustment for 2004. The decision of that court is therefore reversed, and this case is hereby remanded for additional proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

Justice WAINWRIGHT did not participate in the consideration or decision of this case.