State v. Philip Morris USA, Inc., 2007 NCBC 27

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | 98 CVS 14377 |

STATE OF NORTH CAROLINA,

        Plaintiff,

   v.

PHILIP MORRIS USA, INC.;
R.J REYNOLDS TOBACCO
COMPANY; BROWN &
WILLIAMSON TOBACCO
CORPORATION, individually and
as successor by merger to The
American Tobacco Company; and
LORILLARD TOBACCO
COMPANY,

        Defendants.

        ORDER AND OPINION

{1}    The Court is called upon once again to construe certain provisions of the National Tobacco Grower Settlement Trust ("the Phase II Trust" or "the Trust" or "the Trust Agreement" or "the Agreement").[1]  The currently pending cross motions for summary judgment require the Court to determine if enactment of the Fair and Equitable Tobacco Reform Act of 2004 ("FETRA"), Pub. L. No. 108-357, 118 Stat. 1521 (codified as amended in scattered sections of 7 U.S.C.), relieved the defendant tobacco companies of their obligation to fund the Phase II Trust through 2010 solely

---

[1] *See State v. Philip Morris USA, Inc.*, 2004 NCBC 9 (N.C. Super. Ct. Dec. 23, 2004), http://www.ncbusinesscourt.net/120945/2004%20NCBC%209.htm, *rev'd*, 359 N.C. 763, 618 S.E.2d 219 (2005).  The courts of this state have jurisdiction to hear the claims of Maryland and Pennsylvania as Grower States under the Phase II Trust because North Carolina is the original situs of the Trust and North Carolina law governs administration of the Trust and interpretation of the Trust Agreement.  (*See* National Tobacco Grower Settlement Trust § 4.15.)  On August 19, 1999, this Court entered an order approving the Trust, and retains jurisdiction to consider disputes such as this regarding implementation of the Trust.

for the benefit of tobacco farmers in Maryland and Pennsylvania who did not receive any benefits under FETRA. For the reasons set forth below and following the reasoning of the North Carolina Supreme Court in the first FETRA case, *State v. Philip Morris USA, Inc.*, 359 N.C. 763, 618 S.E.2d 219 (2005), the Court holds that the defendant tobacco companies are not relieved of their obligations to the tobacco growers in Maryland and Pennsylvania and grants summary judgment in favor of Maryland and Pennsylvania.

*Ellis & Winters by Richard W. Ellis and Thomas D. Blue Jr., for JPMorgan Chase Bank, as Trustee for National Tobacco Settlement Fund and North Carolina Phase II Tobacco Certification Entity, Inc.; Kelley, Drye & Warren LLP, by Sarah L. Reid for JPMorgan Chase Bank, as Trustee.*

*Attorney General J. Joseph Curran Jr. by Marlene Trestman, David S. Lapp, William F. Brockman and Craig A. Nielsen for Plaintiff State of Maryland Certification Entity.*

*Attorney General Thomas W. Corbett by Joel M. Ressler, Troy L. Beaverson and Tracey D. Tubbs for Plaintiff Commonwealth of Pennsylvania Certification Entity.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Jim W. Phillips Jr. and Charles F. Marshall III for Defendants R.J. Reynolds Tobacco Company, Brown and Williamson Tobacco Company and Lorillard Tobacco Company.*

*Smith Moore LLP by Larry B. Sitton, Gregory G. Holland and Jonathan P. Heyl for Defendant Philip Morris USA Inc.*

Tennille, Judge.

## I.

## BACKGROUND

{2}    In the previous segment of this litigation the North Carolina Supreme Court was called upon to decide if FETRA relieved the defendant tobacco companies ("Settlors" of the Trust) of their obligations to fund the Phase II Trust for the 2004 calendar year. In making that decision the Supreme Court had to interpret the

language in certain provisions of the Phase II Trust containing a Tax Offset Adjustment ("the TOA"). Those same provisions are involved here; however, the claims are different. The prior case dealt with the payments due to the Phase II Trust only for 2004 for all states that were beneficiaries of the Trust ("the Grower States"). Maryland and Pennsylvania were included in that segment of the case because they had claims to the 2004 payments which were founded on the same claims as the other Grower States. Here, the Maryland and Pennsylvania claims are different.[2] These two states seek to require the Settlors to continue to make payments under the terms of the Phase II Trust for the benefit of their tobacco farmers until the Trust terminates in 2010. The Settlors have been relieved of all other obligations to other Grower States under the terms of the Phase II Trust after 2004 because the amounts paid to tobacco farmers and quota holders in those states under FETRA exceeded the amounts due under the Phase II Trust. In fact, the amounts due from the defendant tobacco companies under FETRA exceed the total of all their remaining obligations under the Phase II Trust. Maryland and Pennsylvania farmers grow Maryland Type 32 tobacco and did not participate in the federal tobacco quota programs. Thus, they were not the beneficiaries of any distributions under FETRA. They received benefits under the Phase II Trust up until 2005 when the Settlors contended that they were no longer required to fund the Trust for the benefit of the Maryland and Pennsylvania tobacco growers. Up until 2005 tobacco farmers in other states had received both the benefits of the Phase II Trust and the federal quota system.

{3} The question presented is whether, under the language of the TOA, the Settlors are excused from making payments to the Phase II Trust for tobacco growers who were not beneficiaries of a federal Governmental Obligation[3] when the federal Governmental Obligation created by FETRA exceeded the total obligation of

---

[2] The amounts at issue in the previous phase exceeded four hundred million dollars. By contrast, the total amount at issue here, including payments through 2010 are approximately twenty-five million dollars, or about five million dollars a year. Overall FETRA payments to farmers and quota holders in other states will total billions of dollars. Maryland and Pennsylvania farmers will not participate in those payments.

[3] *See infra* ¶ 10.

the Settlors under the Trust Agreement.  The Court finds they are not.  In doing so the Court has relied heavily on the North Carolina Supreme Court's prior interpretation and application of language in the TOA provision of the Trust Agreement and the very clear purposes for which the Trust was originally created.

## II.

## THE PURPOSE OF THE TRUST

{4}     The rationale for creation of the Trust for tobacco growers is best stated in a letter from Steve Parrish of Philip Morris to the Honorable J. Phil Carlton[4] dated January 14, 1999.  The letter stated in pertinent part:

Dear Judge Carlton:

As I stated in our December 18, meeting in Raleigh, Philip Morris is proud of its tradition of support of American tobacco growers and we have no intention of breaking with that tradition.  We have always met our purchase intentions and, in fact, we have often purchased more than our submitted intentions.  Excluding a small amount of Oriental tobacco, our domestic brands contain 90% or more of American grown tobacco.  As I also said in Raleigh, we intend to continue to maximize our use of domestic tobacco.

As you know, for years there has been a steady decline in cigarette consumption in this country.  This trend will be accelerated as a result of the recent settlement agreement between the industry and the states.  In addition, our export business suffered in 1998 because of significant economic problems in Russia, Asia, and other overseas markets.

These are difficult times for all of us in the tobacco family, particularly for tobacco growers and quota holders, and something obviously needs to be done to address their plight.  In crafting the right solution for this very real problem, it is imperative that we be honest and realistic about the situation.  The fact is, as a result of the recent settlement, there will be a significant reduction in the demand for tobacco in this country.  Whatever is done to address the financial problem of growers and quota holders must take this into account.  It is in no one's best long term interest to devise a system which merely makes a bad situation worse by encouraging growers to produce

---

[4] At the time the letter was written, Judge Carlton was the lead spokesperson for the four largest tobacco companies in their negotiations with the states over the Master Settlement Agreement ("MSA").

tobacco for which there is no demand. We believe growers should be encouraged to grow as much tobacco as can be sold, and that both growers and quota holders should be compensated for the economic harm they suffer as a result of the state settlement.

Philip Morris believes the best way to solve this very real problem is for the four major U.S. cigarette manufacturers to create a trust fund to be administered by the tobacco growing states to compensate tobacco growers and quota holders for this economic harm.

We believe this is the best approach for a number of reasons. First, it gives <u>each state</u> flexibility in determining what is best for its growers and quota holders. Second, it is legally binding on the companies and, therefore, <u>enforceable by the states</u>. As a result, it protects the states against changes in management or future financial problems at the companies. Third, it is a verifiable way of guaranteeing that the money is <u>equitably</u> collected and distributed. Fourth, it is legally within our power to do so. <u>Finally, it provides states, growers and quota holders with an economic safety net for the future.</u>

Letter from Steve Parrish, Chief Executive Officer, Philip Morris Companies, Inc., to the Honorable J. Phil Carlton, Carlton Law Firm (Jan. 14, 1999) (Brief of the Maryland and Pennsylvania Certification Entities Opp. Settlors' Mot. Summ. J. Ex. E) (emphasis added). It is the last sentence which this Court finds compelling. The Trust was created to provide a safety net for tobacco growers. Settlors now seek to remove that safety net for tobacco growers in Maryland and Pennsylvania.

{5}  There were two other purposes for the creation of the Trust highlighted by the Supreme Court in its decision. The court said:

Despite its cost, the Trust appealed to Settlors for financial reasons. Funding the Trust satisfied the requirement of the MSA "to address the economic concerns of the Grower States." In other words, Settlors agreed to the Trust because doing so was a condition of the settlement that had relieved them of potentially bankrupting liability for smoking-related healthcare costs. Additionally, the Trust shields Settlors from claims the Grower States might otherwise bring for economic damages suffered as a result of the MSA.

*Philip Morris*, 359 N.C. at 766, 618 S.E.2d at 221. Settlors received releases from Maryland and Pennsylvania as a result of the creation of the Trust and the inclusion of Maryland and Pennsylvania in the agreement even though they were not states in which tobacco growers participated in the federal tobacco program.

{6}     The Supreme Court used even stronger language with respect to the purpose of the Trust:

> Certainly the most compelling reason for rejecting the trial court's holding is that, taken to its logical extreme, it could defeat the express purpose of the Phase II Trust. As previously explained, the Trust was crafted to protect tobacco farmers from economic harm caused by the MSA. The Trust achieved this goal through annual distributions to the beneficiaries. These distributions were scheduled to furnish tobacco farmers a steady stream of supplemental income until at least 2010.

*Id.* at 779, 618 S.E.2d at 229.

> The court went on to hold:

> Of course, Settlors entered into the Trust Agreement knowing a tobacco buyout program might not materialize until long after their obligation to the Trust had been discharged. . . . Settlors apparently decided the legal protections of the MSA and the Trust Agreement outweighed the risk of having to fund both the Trust and a buyout program in succession. <u>On the other hand, the Grower States entered into the Trust Agreement to obtain a regular source of supplemental income for tobacco farmers hurt by the economic repercussions of the MSA. Interpreting the Trust Agreement in a manner that could leave those individuals without this extra income for years runs squarely counter to the express purpose of the Trust.</u>

*Id.* at 780, 618 S.E.2d at 229 (emphasis added).

{7}     Maryland and Pennsylvania entered into the Trust Agreement and provided releases to obtain a regular source of supplemental income through 2010 for tobacco farmers hurt by the economic repercussions of the MSA at a time when everyone understood that those farmers were not participants in the federal tobacco program. To interpret the Trust Agreement in a manner that could leave those individuals without this extra income for years would run squarely counter to the express purpose of the Trust.

## III.

## INTERPRETATIVE GUIDANCE FROM THE SUPREME COURT

{8} This Court also has the benefit of express and specific guidance from the Supreme Court with respect to the principles of contract interpretation to be applied to this contract.

> Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution. *Lane v. Scarborough*, 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) ("A consent judgment is a court-approved contract subject to the rules of contract interpretation."). Intent is derived not from a particular contractual term but from the contract as a whole. *Jones v. Casstevens*, 222 N.C. 411, 413-14, 23 S.E.2d 303, 305 (1942) ("'Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole.") (citation omitted). Consistent with the aforesaid principles, we must carefully inspect the provisions of the Phase II Trust to ascertain the parties' intention at the time it was executed.

*Id.* at 773, 618 S.E.2d at 225 (footnote omitted).

{9} As previously noted, the Supreme Court was concise and unequivocal in its holding that the purpose of the Trust viewed as a whole was to provide a safety net for farmers impacted by the MSA.

## IV.

## THE CURRENT CONTROVERSY

{10} In this Court's earlier decision it did not find that Congress intended to trigger the provisions of the TOA. Rather, it found that Congress had avoided dealing with the issue, but that the practical effect of the passage of FETRA was to trigger the TOA provision for 2004. The Supreme Court reversed, finding that FETRA did not trigger the TOA provisions until 2005. Here, this Court concludes

again that Congress took no action with a discernable specific intent with respect to the Phase II Trust.  Based upon the guidance from the Supreme Court and its own determination of the purposes of the Phase II Trust, the Court concludes that FETRA did not trigger the TOA provisions as to Maryland and Pennsylvania.  At issue is the meaning of the Tax Offset Provision found at pages A-5 to A-7 of Schedule A of the Trust which read:

**(A-5)** <u>Tax Offset Adjustment</u>. Except as expressly provided below, the amounts to be paid by the Settlors in each of the years 1999 through and including 2010 shall also be reduced upon the occurrence of any change in a law or regulation or other governmental provision that leads to a new, or an increase in an existing, federal or state excise tax on Cigarettes, or any other tax, fee, assessment, or financial obligation of any kind. . . .

**(A-6)** imposed on the purchase of tobacco or any tobacco products or on production of Cigarettes or use of tobacco in the manufacture of Cigarettes at any stage of production or distribution or that is imposed on the Settlors, to the extent that all or any portion of such Governmental Obligation is used to provide: (i) direct payments to [tobacco farmers];  (ii) direct or indirect payments, grants or loans under any program designed in whole or in part for the benefit of [tobacco farmers]; (iii) payments, grants or loans to Grower States to administer programs designed in whole or in part to benefit [tobacco farmers]; or (iv) payments, grants or loans to any individual, organization, or Grower State for use in activities which are designed in whole or in part to obtain commitments from, or provide compensation to [tobacco farmers] to eliminate tobacco production.

The amount of the Governmental Obligation used for any of the purposes set forth above shall be the "Grower Governmental Obligation."

**(A-7)** In the event of such a Governmental Obligation, the amount otherwise required to be paid by each Settlor each year (after taking account of all adjustments or reductions hereunder) shall be reduced by an amount equal to the product of the amount of such Governmental Obligation paid in connection with Cigarettes manufactured by the Settlor (or tobacco or tobacco products used by the Settlor to manufacture Cigarettes) for the same year multiplied by the ratio of the Grower Governmental Obligation divided by the amount of the Governmental Obligation, which reduction amount may be carried forward to subsequent years as necessary to ensure full credit to the Settlor. If the Governmental Obligation results from a law or regulation or other governmental provision adopted by a Grower State, or by a political subdivision within such Grower State, the amount that a Settlor may reduce its payment to the Trust in any one year shall not exceed the

product of the amount the Settlor otherwise would have paid to the Trust in that year in the absence of the Tax Offset Adjustment multiplied by the allocation percentage for the pertinent Grower State set forth in Section 1.03. The Settlor may reduce its annual payment by a reasonable estimate of any such reduction and adjust its payment after the actual amount is finally determined.

*Id.* at 774–75, 618 S.E.2d at 226.

{11}   As they did in the prior phase of this litigation, the parties each read the same language, claiming it to be unambiguous, to support their interpretation of the Trust Agreement.  In this circumstance the Supreme Court has directed this Court to look at the whole of the contract and be guided by its purposes.  The Supreme Court interpreted the contract to provide payments to tobacco farmers as long as those farmers were not receiving double payments from the tobacco companies.  It said:

> The trial court was assuredly correct when it concluded the Tax Offset Adjustment provision was written to keep Settlors from having to fund two payment streams to the <u>same</u> tobacco farmers at the <u>same</u> time. Our decision does nothing to thwart this intent. Rather, we hold that Settlors must actually assume the burden of FETRA before being relieved of their obligations to the Phase II Trust. In so doing we adhere to the plain language of the Tax Offset Adjustment provision and the express purpose of the Trust.

*Id.*  at 781, 618 S.E.2d at 230 (emphasis added).

{12}   Under the present circumstances, the Maryland and Pennsylvania tobacco farmers do not receive any benefit from the buyout generated by FETRA.  They are not double dipping and receiving two streams of income from the tobacco companies at the same time.  If they receive no benefits from the Phase II Trust, the purpose of the Trust will be defeated, as they will be deprived of any supplemental benefits to offset the damages generated by the MSA.  It makes little sense that Maryland and Pennsylvania would execute releases of substantial claims in return for an agreement that payments to their farmers could be eliminated by payments to farmers in other states who were already receiving the benefits from the federal tobacco quota program.

The TOA may be graphically represented as follows:

| Company's Governmental Obligation | x | Grower Governmental Obligation ÷ Governmental Obligation | = | Reduction in Trust Payments |
|---|---|---|---|---|

(Mem. Supp. Mot. of Maryland and Pennsylvania Certification Entities for Summ. J. 9.)

{13} Simply stated, Maryland and Pennsylvania contend that their farmers received no Governmental Obligation; thus the Company's Governmental Obligation is zero, and consequently the Reduction in Trust Payments is zero. The tobacco companies contend that under the Agreement they are obligated to pay up to a fixed amount and that if any Grower Governmental Obligation exceeds the balance then due under the Trust Agreement the companies have no further obligation under the Trust, even if some beneficiaries do not receive benefits under the Grower Governmental Obligation. FETRA assessments are likely to total $5.1 billion compared to the $2.4 billion remaining due under the Trust Agreement when FETRA was passed. The TOA can be logically read to support the position of the tobacco companies. They argue that the Agreement provides a cap on their total liability. However, such a reading defeats the purpose of the Trust as far as the individual states that signed releases are concerned. If the tobacco companies are correct that the impact on an individual state may not be considered, they prevail and this decision should be reversed. This Court believes it is following the guidance of the North Carolina Supreme Court in making its decision based on the clear purpose of the Trust.

# V.

# PROCEDURAL ISSUES

{14}   Several procedural matters require clarification before concluding.  The Court has not considered the deposition testimony from Judge Carlton offered under seal with respect to whether or not the parties considered what would happen if a federal buyout did not include Maryland and Pennsylvania.  The parties' agreement specifically prohibits use of the negotiations in litigation.  Defendants' Motion to Exclude Evidence of Negotiations or Discussions Underlying the Trust in Proceedings Before the Court is granted.  Nor has the Court considered any argument of counsel made in the first phase of this dispute.  The Court directed and the parties understood that the Court had separated the claims to the 2004 distribution from the claims of Maryland and Pennsylvania.  Any comments made in the prior oral arguments were directed to the 2004 distribution and interpretation of the TOA in that context.  The Court does not find any argument of counsel in the first FETRA case to be dispositive of any issue under consideration here.

{15}   The Court also declines to base its ruling on the argument of Maryland and Pennsylvania that the tobacco companies somehow have "unclean hands" by lobbying Congress to exclude their farmers from the buyout.  The tobacco companies had the right to lobby Congress with respect to legislation that would affect their interests and there is no evidence in the record that lobbying by the tobacco companies was the cause of Maryland and Pennsylvania farmers being excluded from buyouts under a federal program in which they had declined to participate.  The Court will not speculate on why Congress provided no relief to Maryland and Pennsylvania farmers.

{16}   Settlors have expressed concern that a decision in favor of Maryland and Pennsylvania might somehow encourage other beneficiaries of the various state programs funded by the payments from the Phase II Trust to assert claims for additional payments.  This opinion would not open the door to such claims.  It is limited solely to the claims of the states of Maryland and Pennsylvania whose

tobacco farmers have not received any benefit from the federal buyout. It is based upon the execution of the releases by those two states which were a quid pro quo for the execution of the Trust Agreement. This order should not be broadly interpreted to create any rights other than the specific rights of Maryland and Pennsylvania to continue to receive payments from the Phase II Trust. No other participating states have such rights and the Court is not creating any "equitable" right to payments not specifically provided in the Trust Agreement.

## VI.
## CONCLUSION

{17} The execution of the Phase II Trust and exchange of releases in return for that execution served two purposes. First, it provided tobacco farmers with relief from the adverse consequences of the MSA's lowering of demand for tobacco products. Second, it provided the tobacco companies with finality to their litigation with the grower states that executed releases. To interpret the language of the Trust provisions to relieve the tobacco companies of their obligation to tobacco farmers in states that executed releases but in which farmers have received no benefit from a Grower Governmental Obligation would defeat the purpose of the Trust as determined by the North Carolina Supreme Court. This Court interprets the language of the Trust to fulfill that purpose, not defeat it.

{18} Maryland and Pennsylvania do not seek to create a new obligation, only to enforce an old one for which they gave consideration in the form of releases from future litigation. Compared to the billions involved in the federal buyout, the payments to Maryland and Pennsylvania tobacco farmers are miniscule. The tobacco companies, tobacco growers and tobacco quota holders in other states all received benefits from FETRA. Maryland and Pennsylvania tobacco farmers received no benefits from FETRA and should not be denied their benefits under the Phase II Trust Agreement.

{19}     Finally, the Court notes once again that the decision to grant a writ of petition for discretionary review lies exclusively with the Supreme Court.  *See State v. Philip Morris USA Inc.*, 2004 NCBC 9 ¶ 113 n.31 (N.C. Super. Ct. Dec. 23, 2004), http://www.ncbusinesscourt.net/120945/2004%20NCBC% 209.htm, *rev'd*, 359 N.C. 763, 618 S.E.2d 219 (2005).  This Court can only express its views that the issues decided here are of "significant public interest" warranting certification for review by the Supreme Court without delay.  *See* N.C. Gen. Stat. § 7A-31(a)–(b).

{20}     Based upon the foregoing, it is, therefore, ORDERED:

1.     The Motion of Maryland and Pennsylvania Certification Entities for Summary Judgment is GRANTED.

2.     The Settlors' Motion for Summary Judgment is DENIED.

This the 17th day of August, 2007.