PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WILLIAM J. NEESE; DANIEL M.
JOHNSON,
  *Plaintiffs-Appellants,*

v.

MIKE JOHANNS, Secretary of
Agriculture; UNITED STATES
DEPARTMENT OF AGRICULTURE;
COMMODITY CREDIT CORPORATION;
PHILIP MORRIS USA, INCORPORATED,
  *Defendants-Appellees.*

No. 06-2119

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
Samuel G. Wilson, District Judge.
(1:05-cv-00071-sgw)

Argued: December 5, 2007

Decided: March 3, 2008

Before NIEMEYER and SHEDD, Circuit Judges, and
Leonie M. BRINKEMA, United States District Judge for the
Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Brinkema wrote the opinion,
in which Judge Niemeyer and Judge Shedd joined.

## COUNSEL

**ARGUED:** Daniel S. Haltiwanger, RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, L.L.C., Barnwell, South Carolina,

for Appellants. R. Hewitt Pate, HUNTON & WILLIAMS, Richmond, Virginia; Sarang Damle, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Daniel H. Caldwell, Cameron Scott Bell, PENN, STUART & ESKRIDGE, Abingdon, Virginia, for Appellants. Peter D. Keisler, Assistant Attorney General, John L. Brownlee, United States Attorney, Mark B. Stern, Eric J. Feigin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Lonnie D. Nunley, III, Kevin C. Walsh, Carrie B. Freed, HUNTON & WILLIAMS, Richmond, Virginia; Larry B. Sitton, Gregory G. Holland, Jonathan P. Heyl, SMITH MOORE, L.L.P., Greensboro, North Carolina, for Appellee Philip Morris USA, Incorporated.

---

## OPINION

BRINKEMA, District Judge:

Appellants William Neese and Daniel Johnson, producers of burley tobacco, seek to challenge the Secretary of Agriculture's implementation of the Fair and Equitable Tobacco Reform Act of 2004 ("FETRA"). The Act authorized the Secretary to offer buyout contracts to tobacco producers who had previously operated under a fixed quota system, which had been in place since the late 1930s. The Secretary offered, and the appellants accepted, a series of contracts for annual payments over the course of ten years. Appellants then assigned those contracts, and all accompanying rights, to third parties in exchange for a lump sum payment.

Invoking the Administrative Procedure Act, 5 U.S.C. § 702, appellants contend that the Secretary improperly calculated their contract payouts under FETRA and assert an entitlement to additional payments. The district court dismissed the complaint for lack of standing. We agree and affirm. Appellants abandoned any right to challenge the Secretary's calculations when they assigned their buyout contracts to third parties.

I.

Beginning in 1938, Congress tasked the Department of Agriculture with controlling the production and price of tobacco. Tobacco produc-

ers operated under a system of quotas and price supports, which limited the amount of tobacco that any one producer could grow and market. Congress reversed course in 2004, passing the Fair and Equitable Tobacco Reform Act, Pub. L. No. 108-357, 118 Stat. 1521 ("FETRA"). The statute ended the previous regulatory regime in favor of a free-market approach.

As part of the transition to a free-market, FETRA directed the Secretary of Agriculture to offer payment contracts to tobacco quota holders and tobacco producers who had operated under the old system. *See* 7 U.S.C. §§ 518a, 518b. Expenditures could not exceed $10.14 billion.[1] § 518f. Of that total, $9.6 billion was available for disbursement — $6.7 billion to quota holders and $2.9 billion to producers. *See* 70 Fed. Reg. 17,156-57.

The present litigation implicates the Secretary's method of calculating payments to flue-cured and burley tobacco producers.[2] Under FETRA, an eligible producer's baseline payment would be fixed by the producer's tobacco quota, in pounds, for the 2002 marketing year, multiplied by $3.00. 7 U.S.C. §§ 518b(c)(2), (d)(1). The payment was then subjected to two downward adjustments. First, the calculation was reduced by one-third for each of the years between 2002 and 2004 in which the producer did not actually produce any tobacco. § 518b(d)(3). Second, where multiple producers came together to produce the same tobacco quota, FETRA directed the Secretary to provide "an equitable distribution among the persons of the contract payments . . . based on relative share of such persons in the risk of producing the quota tobacco and such other factors as the Secretary considers appropriate." § 518b(b)(2).

---

[1]The payments would be funded through assessments on tobacco manufacturers and distributors and paid out over a ten year period. *See* 7 U.S.C. §§ 518b(d)(2), 518d.

[2]A producer of quota tobacco is defined as any "owner, operator, landlord, tenant, or sharecropper that shared in the risk of producing tobacco on a farm where tobacco was produced or considered planted pursuant to a tobacco farm poundage quota . . . ." § 518(6). The terms "flue-cured" and "burley" refer to the manner in which the tobacco is cured — either by heat or by air.

FETRA also directed the Secretary to promulgate implementing regulations. § 519a. In an attempt to comply with the statute's command of an "equitable distribution" across multiple producers of the same tobacco quota, the Secretary adopted a rather complex method to assess relative risk. First, the Secretary would calculate the base quota level for each farm during the years 2002, 2003, and 2004. Then, the 2003 and 2004 quotas were normalized to the 2002 quota levels. Next, the Secretary ascertained the number of quota pounds for which the particular producer bore the risk during each of the three marketing years; and finally, the Secretary awarded $1 to the producer for each eligible pound.[3] *See* 7 C.F.R. § 1463.106; 70 Fed. Reg. at 17,155. Put succinctly, the Secretary's method of equitable allocation looked to each producer's performance during the 2002, 2003, and 2004 marketing years when dividing up the base quota level.

In a letter to the agency, dated April 19, 2005, appellant Neese objected to this distribution scheme, arguing that a tobacco producer who was active during the 2002, 2003, and 2004 marketing years was entitled to $3.00 per pound multiplied only by his equitable share of the 2002 quota. The agency dismissed that argument and notified him that objections to general program and administrative provisions were not administratively appealable. Neese did not pursue further administrative action to contest the formula, nor did he seek immediate judicial intervention.

Under the Secretary's regulations, an eligible tobacco producer must have applied for a contract by June 15, 2005 in order to receive his full payout. *See* 7 C.F.R. § 1463.108(c). Both Neese and Johnson timely applied for payment contracts and the Secretary approved them in August 2005.[4] The contracts incorporated the Secretary's regula-

---

[3]The Commodity Credit Corporation ("CCC"), a corporation within the Department of Agriculture, was tasked with the calculation and dispersal of payments.

[4]The offer of a contract was conveyed by "Form CCC-956, Tobacco Transition Producer Contract." Form CCC-956's appendix states that the document "shall be considered an offer to enter into a Tobacco Transition Payment Producer Contract on the terms specified on Form CCC-956." The document "becomes effective when signed by the participant and CCC."

tions by reference and identified the producer's adjusted base quota level for each of the 2002, 2003, and 2004 marketing years. Neese's and Johnson's contracts provided for payments totaling $189,793 and $219,977, respectively. Altogether, the Secretary entered into over 183,000 contracts with tobacco producers totaling $2.87 billion in payments — 99.2% of the program's $2.9 billion limit.

On August 16, 2005, appellants filed a federal lawsuit on behalf of themselves and all similarly situated flue-cured and burley tobacco producers, arguing that the Secretary's formula violated FETRA's payment provisions, resulting in their underpayment. Among other relief, they requested class certification for all similarly situated tobacco producers, a declaratory judgment that the Secretary's regulations are invalid, and an injunction ordering the Secretary to comply with FETRA and enter into contracts with producers under the proper payment formula.

FETRA allows those producers who do not want to receive payments over a ten year period to assign their contract payment to a financial institution in exchange for a lump sum payment. *See* 7 U.S.C. § 518c(e); 7 C.F.R. § 1463.100(b). After initiating this civil action, each appellant entered successor-in-interest contracts with a third party to obtain an immediate lump sum payment — Neese with Farm Bureau TTPP, LLC, on October 20, 2005, and Johnson with Farm Credit of the Virginias FLCA on December 1, 2005. Each successor-in-interest contract included the statement that the successor-in-interest contract terminated "all rights of the Transferor with respect to the Existing Contract," transferring them to the successor. *See* 7 C.F.R. § 1463.100(b) ("[A]ll rights and obligations of the quota holder or producer, with respect to payments made by [the Secretary] under this part, will be terminated and transferred to the successor party.").

On January 23, 2006, the district court granted Philip Morris USA, Inc.'s motion to intervene as of right.[5] The parties thereafter filed cross motions for summary judgment and Philip Morris USA moved

---

[5]As a tobacco manufacturer, Philip Morris must pay quarterly assessments to fund the payment contracts and, therefore, retains an interest in the Secretary's method of calculating payments.

to dismiss the complaint for lack of standing. On September 28, 2006, in a published opinion, the district court held that appellants lacked standing to prosecute their suit: "plaintiffs cannot challenge the Secretary's formula separate and apart from a challenge to their producer contracts, which they have transferred to third parties." *Neese v. Johanns*, 450 F. Supp. 2d 632, 637 (W.D. Va. 2006). The district court went on to hold that, even if appellants had standing, it would not grant discretionary and equitable relief due to impracticability and the resulting disruption to the buyout program. *Id*. at 638. Specifically, the district court observed that under appellants' view of the correct payment formula, a number of tobacco producers were overpaid. Either they would have to disgorge payments or the Secretary would have to levy an additional assessment on tobacco manufacturers and importers. The court also held that much of that potential for disruption to the program was due to appellants' failure to "seek to enjoin the Secretary from implementing his regulatory formula"; they instead "entered into producer contracts[ ] and transferred their interests to third parties." *Id*.

Appellants filed a timely notice of appeal.

## II.

The district court had jurisdiction over this action under 28 U.S.C. § 1331 and § 1337. We have jurisdiction to review the district court's ruling under 28 U.S.C. § 1291.

## III.

We conduct a *de novo* review of the district court's decision to dismiss for lack of standing. *See Smith v. Frye*, 488 F.3d 263, 272 (4th Cir. 2007).

## IV.

To have standing to bring this action, appellants must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). To satisfy the injury-in-fact ele-

ment, a plaintiff must demonstrate "an invasion of a legally protected interest which is . . . concrete and particularized." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

In this case, any claim to a specific sum of money must flow from the contractual relationship between the Secretary and the producer. *See* 7 U.S.C. § 518b(a) ("The Secretary shall offer to enter into a *contract . . . under which* the producer of quota tobacco shall be entitled to receive payments under this section . . . .") (emphasis added). Appellants, however, cannot maintain such a claim. After accepting the Secretary's offer of payment contracts without reservation and entering into those contracts, they transferred all their rights under those contracts to third parties. Quite simply, appellants have no rights left to invoke and, therefore, lack standing to pursue further contracts or payments from the Secretary.

*AFFIRMED*