STATE OF NORTH CAROLINA, PLAINTIFF v. PHILIP MORRIS USA INC., R.J. REYNOLDS TOBACCO COMPANY, BROWN & WILLIAMSON TOBACCO CORPORATION, INDIVIDUALLY AND AS SUCCESSOR BY MERGER TO THE AMERICAN TOBACCO COMPANY; AND LORILLARD TOBACCO COMPANY, DEFENDANTS

No. COA07-1572

(Filed 16 December 2008)

**Contracts— tobacco settlement—payments to trust—payments for end of price support—offset**

The trial court erred by denying summary judgment for Philip Morris and granting summary judgment for Maryland and Pennsylvania in an action arising from the settlement of litigation over the health effects of tobacco. Maryland and Pennsylvania had sought an order requiring that the tobacco companies be required to continue payments to a trust for the benefit of their farmers after the tobacco companies stopped making those payments under an offset provision in the trust when they began payments under a separate program to end the federal system of price supports and quotas for growing tobacco. Maryland and Pennsylvania had not participated in the price support system, and their farmers did not receive payments under the act ending the system.

Judge ELMORE dissenting.

Appeal by defendants from order entered 17 August 2007 by Judge Ben F. Tennille in Wake County Superior Court. Heard in the Court of Appeals 20 August 2008.

*Attorney General of Maryland Douglas F. Gansler, by Special Assistant to the Attorney General Marlene Trestman and Assistant Attorneys General David S. Lapp and Craig A. Nielsen and Attorney General of Pennsylvania Thomas W.*

STATE v. PHILIP MORRIS USA, INC.

[194 N.C. App. 255 (2008)]

*Corbett, Jr., by Chief Deputy Attorney General Joel M. Ressler and Deputy Attorney General Tracey Dey Tubbs, for plaintiff-appellee.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Jim W. Phillips, Jr. and Charles F. Marshall, III, for defendant-appellants.*

*Smith Moore, L.L.P., by Larry B. Sitton, Gregory G. Holland and Jonathan P. Heyl, for defendant-appellant Philip Morris USA Inc.*

*Kennedy, Covington, Lobdell & Hickman, L.L.P., by William G. Scoggin, for amicus curiae North Carolina Citizens for Business and Industry.*

TYSON, Judge.

Philip Morris USA, Inc., R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company (collectively, "Settlors") appeal order entered, which denied their motion for summary judgment and granted the motion for summary judgment submitted by Maryland Certification Entity ("Maryland") and Pennsylvania Certification Entity ("Pennsylvania"). We reverse and remand.

## I. Background

During litigation over the health effects of tobacco and its impact on state funding in the 1990s, Settlors and their predecessors-in-interest entered into a Master Settlement Agreement ("MSA") with various states and territories. *State v. Philip Morris USA, Inc.,* 359 N.C. 763, 765, 618 S.E.2d 219, 221 (2005) (*"Philip Morris I"*). One of the MSA's aims was to reduce the public's consumption of tobacco and its related health impacts on state budgets. The parties anticipated that reduced consumption "could cause tobacco growers and quota holders ('tobacco farmers') significant economic hardship." *Id.* To address this problem, the MSA required Settlors "to devise a plan for mitigating the MSA's potentially negative economic consequences." *Id.* The result of this plan was a Trust Agreement, signed by the parties, under which "Settlors pledged to spend approximately $5.15 billion on economic assistance to tobacco farmers in Grower States." *Id.* The tobacco grower states listed in the Trust Agreement were: Alabama, Florida, Georgia, Indiana, Kentucky, Maryland, Missouri, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia. *Id.*

The Trust Agreement provides economic assistance to tobacco farmers through annual distributions. Settlors fund the Trust through scheduled base payments and the Trustee distributes money in the Trust to the Grower States based on a percentage allocation schedule contained in the agreement. Each Grower State established a Certification Entity to receive these payments from the Trustee. Each Certification Entity distributes the funds as it deems appropriate to tobacco growers located within its state.

Schedule A of the Trust Agreement contains a Tax Offset Adjustment ("TOA") provision. The TOA provision "entitles Settlors to reduce their Annual Payment in response to the imposition of a 'Governmental Obligation,' which is a new or increased cigarette tax used in whole or in part for the benefit of tobacco farmers." *Id.* at 767, 618 S.E.2d at 222. Our Supreme Court, in *Philip Morris I* resolved the issue of whether the TOA is "contingent upon [an] actual payment of a Governmental Obligation." 359 N.C. at 771, 618 S.E.2d at 224.

That previous appeal arose after Congress's October 2004 passage of the Fair and Equitable Tobacco Reform Act of 2004 ("FETRA"). Pub. L. No. 108-357, 118 Stat. 1521 (codified as amended in scattered sections of 7 U.S.C.). FETRA "terminated the price control/quota system for U.S. tobacco beginning with the 2005 crop," and "direct[ed] the U.S. Secretary of Agriculture to offer tobacco farmers annual payments during fiscal years 2005 through 2014 in exchange for ending marketing quotas and related price supports." *Philip Morris I*, 359 N.C. at 769-70, 618 S.E.2d at 223.

All Grower States listed in the Trust Agreement, except Maryland and Pennsylvania, had participated in the federal system of quotas and price supports that FETRA eliminated. "As part of the transition to a free-market, FETRA directed the Secretary of Agriculture to offer payment contracts to tobacco quota holders and tobacco producers who had operated under the old system." *Neese v. Johanns*, 518 F.3d 215, 217 (4th Cir. 2008) (citing 7 U.S.C. §§ 518a, 518b). FETRA made $6.7 billion available to tobacco quota holders and $2.9 billion available to tobacco producers. *Id.* It is undisputed that the amounts Settlors are required to pay to tobacco farmers under FETRA exceeds the amounts they were due to pay under the Trust Agreement.

Maryland and Pennsylvania tobacco farmers received no FETRA payments because those states had chosen not to participate in the federal tobacco quota and price support system. Settlors paid all sums due under the Trust Agreement until they were required to

begin payments under FETRA. Maryland and Pennsylvania stopped receiving Trust benefits in 2005, after Settlors asserted they were no longer required to fund the Trust due to the TOA provision because of their payment obligations under FETRA. In the trial court, Maryland and Pennsylvania sought to require Settlors to continue making Trust payments for the benefit of their states' tobacco farmers, despite the TOA provision both states had agreed to in the Trust Agreement.

On 17 December 2004, Maryland and Pennsylvania moved the trial court to enter an order that either clarifies or modifies the Trust Agreement to ensure that Settlors will continue to make annual Trust payments for the benefit of Maryland and Pennsylvania tobacco growers. Maryland and Pennsylvania alleged that FETRA "raise[d] a situation not anticipated by the parties to the Trust Agreement—a federal Governmental Obligation that benefits tobacco farmers in some states but not others." Both parties moved for summary judgment. The trial court granted Maryland and Pennsylvania's motion for summary judgment and denied Settlors' motion. Settlors appeal.

### II.  Issue

Settlors argue the trial court erred when it disregarded the plain and unambiguous language of the Trust Agreement, denied their motion for summary judgment, and granted summary judgment for Maryland and Pennsylvania.

### III.  Standard of Review

In *Philip Morris I*, our Supreme Court stated: "this case is one of contract interpretation, and we review the trial court's conclusions of law *de novo*." 359 N.C. at 773, 618 S.E.2d at 225 (citing *Register v. White*, 358 N.C. 691, 693, 599 S.E.2d 549, 552 (2004)).

### IV.  Intention of the Parties

Settlors argue the trial court "misunderstood and misapplied the Supreme Court's decision" by failing to follow or apply the principles of contract interpretation set forth in established case law and by the Supreme Court in *Philip Morris I*. We agree.

Our Supreme Court stated in *Philip Morris I*:

Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution. *Lane v. Scarborough*, 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973). "If the plain language of a contract is clear, the intention of the parties is inferred from the

words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) ("A consent judgment is a court-approved contract subject to the rules of contract interpretation."). Intent is derived not from a particular contractual term but from the contract as a whole. *Jones v. Casstevens*, 222 N.C. 411, 413-14, 23 S.E.2d 303, 305 (1942) (" 'Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole.' ") (citation omitted).

359 N.C. at 773, 618 S.E.2d at 225 (footnote omitted).

The TOA provision contained in Schedule A of the Trust Agreement states:

Except as expressly provided below, the *amounts to be paid by the Settlors* in each of the years 1999 through and including 2010 *shall also be reduced* upon the occurrence of *any change in a law or regulation or other governmental provision that leads to a new*, or an increase in an existing, federal or state excise tax on Cigarettes, or any other tax, fee, assessment, or *financial obligation of any kind* . . . imposed by any governmental authority ("Governmental Obligation") that is based on the purchase of tobacco or tobacco products or on production of Cigarettes or use of tobacco in the manufacture of Cigarettes at any stage of production or distribution or *that is imposed on the Settlors, to the extent that all or any portion of such Governmental Obligation is used to provide:*

(i) *direct payments to Tobacco Growers or Tobacco Quota Owners;*

(ii) direct or indirect payments, grants or loans under any program designed in whole or in part for the benefit of Tobacco Growers, Tobacco Quota Owners or organizations representing Tobacco Growers or Tobacco Quota Owners . . .;

(iii) payments, grants or loans to Grower States to administer programs designed in whole or in part to benefit Tobacco Growers, Tobacco Quota Owners or organizations representing Tobacco Growers or Tobacco Quota Owners . . .; or

(iv) payments, grants or loans to any individual, organization, or Grower State for use in activities which are designed

in whole or in part to obtain commitments from, or provide compensation to, Tobacco Growers or Tobacco Quota Owners to eliminate tobacco production.

(Emphasis supplied).

The Settlor's FETRA payments clearly result from a "Governmental Obligation" that "provide[s] . . . direct payments to Tobacco Growers or Tobacco Quota Owners . . . ." "FETRA payments to tobacco farmers between 2005 and 2014 will approach $9.6 billion." *Id.* at 769, 618 S.E.2d at 223. As noted earlier, it is undisputed that the amounts Settlors must pay under FETRA exceeds the amounts Settlors are to pay under the Trust Agreement. FETRA payments are a "Governmental Obligation" that fit squarely under the plain and unambiguous terms of the TOA provision contained in Schedule A of the Trust Agreement.

Our Supreme Court recognized in *Philip Morris I* that:

Problems with the tobacco industry prompted members of Congress to introduce more than twenty tobacco buyout bills from 1997 through 2004. The parties to the Phase II Trust understood they had much to gain from legislation ending quotas and price controls. The Grower States recognized a federal buyout program would almost certainly offer larger payments to tobacco farmers than those available under the Trust.

359 N.C. at 769, 618 S.E.2d at 223. At the time the TOA provision was drafted and agreed to by all parties, attorneys for Settlors and Maryland and Pennsylvania knew or should have known that FETRA or a similar national tobacco grower payment plan was not only a possibility, but a probability. With the October 2004 passage of FETRA, a "Governmental Obligation" was created, which "provide[s] . . . direct payments to Tobacco Growers or Tobacco Quota Owners . . . ."

No language in the Trust Agreement suggests that an obligation imposed by the federal government would not offset Settlor's obligations under the Trust Agreement or trigger a state-by-state application of the TOA to some grower states and not others, as Maryland and Pennsylvania argue we should hold. If the parties to the Trust Agreement had intended for a state-by-state application of the TOA be based upon a "Governmental Obligation" imposed by the federal government, the agreement would have included or incorporated such a provision. *See Indemnity Co. v. Hood*, 226 N.C. 706, 710, 40

S.E.2d 198, 201 (1946) ("It must be presumed the parties intended what the language used clearly expresses and the contract must be construed to mean what on its face it purports to mean." (Citations omitted)). None of the other Grower States have challenged the Settlors' right to offset the FETRA payments against those which would have otherwise been due under the Trust Agreement.

The parties to the agreement clearly understood the significance of offsets to one state and not another and included a state-by-state adjustment clause in the TOA provision. A state-by-state adjustment provision for any "Governmental Obligation" imposed by a "Grower State" is specifically stated:

> If the Governmental Obligation results from a law or regulation or other governmental provision adopted by a Grower State, or by a political subdivision within such Grower State, the amount that a Settlor may reduce its payment to the Trust in any one year shall not exceed the product of the amount the Settlor otherwise would have paid to the Trust in that year in the absence of the Tax Offset Adjustment multiplied by the allocation percentage for the pertinent Grower State set forth in Section 1.03.

Our Supreme Court stated in *Philip Morris I* that "[g]iven the degree of lawyerly scrutiny each word of the Trust Agreement doubtless underwent, we are not inclined to interpret the terms of Schedule A in a fashion that deviates from the meaning commonly ascribed to them." 359 N.C. at 775, 618 S.E.2d at 227. Our Supreme Court's prior interpretation of this provision and the plain language of the TOA provision contained in Schedule A compels us to hold that Settlors are entitled to offset amounts paid under FETRA against the amounts due to all Grower States under the Trust Agreement. *Id.*; *see Walton*, 342 N.C. at 881, 467 S.E.2d at 411 ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract.").

Our adherence to the plain and unambiguous language of the TOA provision is not contrary to the express purpose of the trust. "The preamble announces the purpose of the Trust: '[T]o provide aid to Tobacco Growers and Tobacco Quota Owners and thereby to ameliorate potential adverse economic consequences to the Grower States.' " *Philip Morris I*, 359 N.C. at 766, 618 S.E.2d at 221.

In *Philip Morris I*, our Supreme Court stated, "we hold that Settlors must actually assume the burden of FETRA before being

relieved of this obligations to the Phase II Trust. In so doing, we adhere to the plain language of the Tax Offset Adjustment provision and the express purpose of the Trust." 359 N.C. at 781, 618 S.E.2d at 230. Settlors have now "assum[ed] the burden of FETRA" and are entitled to the benefit and relief they bargained for under the TOA provision. *Id.* FETRA is a "Governmental Obligation," which "provide[s] aid to Tobacco Growers and Tobacco Quota Owners[,]" and fits squarely under the plain and unambiguous meaning of the terms of the TOA provision. The trial court erred when it granted Maryland and Pennsylvania's motion for summary judgment and denied Settlors' motion for summary judgment.

## V. Conclusion

Considering the agreement as a whole, FETRA payments are a "Governmental Obligation," which fit squarely under the plain and unambiguous terms of the TOA provision contained in Schedule A of the Trust Agreement. *Id.* The amounts that Settlors must pay under FETRA to tobacco producers and tobacco quota owners exceeds the amounts due to be paid under the Trust Agreement. The TOA provision expressly and unambiguously states that settlors are entitled to offset any "Governmental Obligation" paid under FETRA against the amounts due under the Trust Agreement. The trial court's order is reversed and this case is remanded for entry of judgment in favor of Settlors.

Reversed and Remanded.

Judge CALABRIA concurs.

Judge ELMORE dissents by separate opinion.

ELMORE, Judge, dissenting.

For the following reasons, I respectfully dissent from the majority opinion reversing the Business Court.

This Court is bound by any decision issued by the Supreme Court. *Dunn v. Pate*, 334 N.C. 115, 118, 431 S.E.2d 178, 180 (1993). Even when we question a defunct holding or line of reasoning—which is not the case here—we cannot overrule the Supreme Court. *See Cannon v. Miller*, 313 N.C. 324, 324, 327 S.E.2d 888, 888 (1985) (vacating a Court of Appeals decision after observing "that the panel of Judges of the Court of Appeals to which this case was assigned has

acted under a misapprehension of its authority to overrule decisions of the Supreme Court of North Carolina and its responsibility to follow those decisions, until otherwise ordered by the Supreme Court"). Here, we have been asked to interpret a contract that our Supreme Court has already interpreted. Accordingly, I believe that we, like the Business Court, are bound by the Supreme Court's interpretation of that contract.

Settlors argue that the Business Court "misunderstood and misapplied the Supreme Court's decision" by failing to follow or apply the principles of contract interpretation set forth by the Supreme Court in *Philip Morris I*. "Instead of applying the Trust's plain language, the Business Court went immediately to the 'purpose' of the Trust and held that purpose would be defeated if growers in Maryland and Pennsylvania did not receive their Trust payments." Settlors contend that the Business Court should have "look[ed] first to the plain language of the TOA provision to discern the parties' intent—and improperly began its analysis with what it perceived to be the Trust's 'general purpose.' " Settlors posit that the Business Court "rewrote the terms of the parties' agreement to impose upon Settlors an additional payment obligation that does not appear in *any* provision of the Trust" and thereby "effectively wrote the TOA out of the Trust entirely as to Maryland and Pennsylvania."

Settlors characterize the Supreme Court's opinion as looking to the Trust's purpose as an afterthought, and by doing so imply that a contract's express purpose should have no effect on a court's interpretation of that contract. Instead, they argue, meaning should be gleaned only by parsing that contract's component pieces. I disagree with Settlors' characterization and find it to be in opposition to both the Supreme Court's opinion in *Philip Morris I* and traditional notions of contract interpretation.

The Supreme Court began its opinion by briefly reviewing the background of the Master Settlement Agreement and the Trust Agreement's origins. In describing how the Trust Agreement operates, the Supreme Court started with the preamble, which "announces the purpose of the Trust: '[T]o provide aid to Tobacco Growers and Tobacco Quota Owners and thereby to ameliorate potential adverse economic consequences to the Grower States.' " *Philip Morris I*, 359 N.C. at 766, 618 S.E.2d at 221 (citation omitted; alteration in original). The Court then explained that "[t]he Trust accomplishes this objective through annual distributions to the beneficiaries. These distributions supplement the declining incomes of tobacco farmers as they

adapt to an economy in which the MSA has dulled the appetite for tobacco." *Id.* (citation omitted).

After explaining the Trust's operation and the passage and impact of FETRA, the Court began its analysis by laying out the following ground rules for contract interpretation:

> Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution. If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract. *Intent is derived not from a particular contractual term but from the contract as a whole.*

*Id.* at 773, 618 S.E.2d at 225 (quotations and citations omitted; emphasis added).

The Court then set out to "carefully inspect the provisions of the Phase II Trust to ascertain the parties' intention at the time it was executed." *Id.* at 773, 618 S.E.2d at 226. As Settlors point out in their briefs, the Court "look[ed] first to the plain language of the Tax Offset Adjustment provision to discern the intent of the parties." *Id.* at 773, 618 S.E.2d at 227. After reviewing relevant portions of the TOA provision, the Court concluded that the trial court's construction was improper and that the Trustees' interpretation was correct. The Court then continued,

> Furthermore, we very much doubt the trial court's construction of the wording on pages A-5 to A-6 reflects the original understanding of the parties. The court would allow a Tax Offset Adjustment even if the government never collects the assessments due under a qualifying change of law and hence never spends them for the benefit of *tobacco farmers.* Under those circumstances, *tobacco farmers* would receive reduced distributions (or no distributions) from the Phase II Trust and nothing from the government. The negative financial implications of this scenario for *tobacco farmers* are obvious.

*Id.* at 777, 618 S.E.2d at 228 (emphases added). In its opinion, the Court repeatedly returned to how each party's interpretation of the TOA provision would impact tobacco farmers. The TOA provision does not constitute the entire agreement between the parties; it constitutes one part of the larger Trust Agreement. The Court recognized that the proper interpretation of the TOA provision had to be consistent with the purpose and intent underlying the Trust Agreement.

The Court's review of the Trust Agreement's purpose and the parties' intent was not perfunctory, as Settlors claim; the Court stated that its interpretation "*must be* [considered] in the context of the entire Trust Agreement." *Id.* (citation omitted; emphasis added).

The Court continued,

> Certainly the *most compelling reason* for rejecting the trial court's holding is that, taken to its logical extreme, it could defeat the express purpose of the Phase II Trust. As previously explained, *the Trust was crafted to protect tobacco farmers from economic harm caused by the MSA*. The Trust achieved this goal through annual distributions to the beneficiaries. These distributions were scheduled to furnish tobacco farmers a steady stream of supplemental income until at least 2010.

*Id.* at 779, 618 S.E.2d at 229 (emphases added). Two paragraphs later, the Court again emphasized the paramount importance of the Trust Agreement's purpose:

> [T]he Grower States entered into the Trust Agreement to obtain a regular source of supplemental income for tobacco farmers hurt by the economic repercussions of the MSA. Interpreting the Trust Agreement in a manner that could leave those individuals without this extra income for years runs squarely counter to the express purpose of the Trust.

*Id.* at 780, 618 S.E.2d at 229.

The Business Court read the Supreme Court's opinion as "concise and unequivocal in its holding that the purpose of the Trust viewed as a whole was to provide a safety net for farmers impacted by the MSA." *North Carolina v. Philip Morris USA, Inc.*, 2007 NCBC LEXIS 7, at *9,. 98 CVS 14377 (2007). The Business Court characterized Settlors' interpretation of the TOA provision as unequivocally stating that there could be no state-by-state accounting:

> The tobacco companies contend that under the Agreement they are obligated to pay up to a fixed amount and that if any Grower Governmental Obligation exceeds the balance then due under the Trust Agreement the companies have no further obligation under the Trust, even if some beneficiaries do not receive benefits under the Grower Governmental Obligation.

*Id.* at *13. The States, however, argued that the· TOA provisions unequivocally state that, if farmers do not receive the benefits of a

Governmental Obligation, then the value of that Governmental Obligation is zero and the corresponding reduction in trust payments is zero. *Id.* The Business Court admitted that "[t]he TOA can be logically read to support the position of the tobacco companies" by "provid[ing] a cap on their total liability." *Id.* However, the Business Court held that "such reading defeats the purpose of the Trust as far as the individual states that signed releases are concerned." *Id.* The Business Court concluded that Settlors' interpretation could not be correct because it violates the Trust's express purpose, and therefore a state-by-state accounting of actual Governmental Obligations is appropriate.

Settlors point out that the Business Court based its decision almost exclusively on the Trust's purpose as articulated by the Supreme Court. Although the Business Court's decision does lack significant textual analysis, the absence of that analysis does not mean that the Business Court reached the wrong conclusion or that its reliance on the Trust's express purpose was misplaced.

There is no ambiguity as to the Trust Agreement's purpose or the parties' intentions; our Supreme Court has clearly set out both. As the Business Court noted, however, "the parties each read the same language, claiming it to be unambiguous, to support their interpretation of the Trust Agreement." *Id.* at *11. Our Supreme Court has observed that

> [w]hile [t]he fact that a dispute has arisen as to the parties' interpretation of the contract is some indication that the language of the contract is at best, ambiguous, ambiguity . . . is not established by the mere fact that the plaintiff makes a claim based upon a construction of its language which [his opponent] asserts is not its meaning.

*Brown v. Lumbermens Mut. Casualty Co.*, 326 N.C. 387, 392, 390 S.E.2d 150, 153 (1990) (quotations and citations omitted). The ambiguity, if there is any, arises here only in the context of whether the TOA provision explicitly mandates or prohibits a state-by-state accounting of reductions resulting from Grower Governmental Obligations. When the contract is read *as a whole*, however, it is clear that the parties intent was to protect tobacco farmers from the economic harm caused by the MSA. I believe that the Business Court properly interpreted the Trust Agreement *as a whole* and concluded that the TOA requires Settlors to continue making payments to the

Trust sufficient to meet the annual amounts allocated to Maryland and Pennsylvania under Section 1.03 of the Trust Agreement.

Had the Business Court concluded otherwise, the effective result would be that Maryland and Pennsylvania tobacco growers would receive no distributions. The Supreme Court rejected this outcome in *Philip Morris I* by looking at the potential economic effects if the TOA were read to allow "Tax Offset Adjustments absent the actual payment of a Governmental Obligation" as Settlors urged. *Philip Morris I*, 359 N.C. at 778, 618 S.E.2d at 228. The Court noted that the Business Court would have given

> Settlors a Tax Offset Adjustment for 2004 regardless of when FETRA assessments are actually paid. Thus, had FETRA assessments been delayed until 2010, tobacco farmers would have been forced to endure the adverse economic consequences of the MSA for six years without the regular financial support the Phase II Trust was designed to supply.

*Id.* at 779, 618 S.E.2d at 229. The Court scorned this potential outcome as "run[ning] squarely counter to the express purpose of the Trust." *Id.* at 780, 618 S.E.2d at 229. It seems incongruous to now change course and find this result acceptable.

Accordingly, I would hold that the trial court properly granted Maryland and Pennsylvania's motion for summary judgment and properly denied Settlors' motion for summary judgment.