*SVAP II Pasadena Crossroads LLC v. Fitness International LLC*, No. 1982, Sept. Term, 2022. Opinion filed on December 20, 2023, by Berger, J.

STANDING – BREACH OF CONTRACT ACTION – RENT ACCRUED PRIOR TO SALE OF PROPERTY

Under Maryland law, when there is a transfer of title, unpaid accrued rent, unless otherwise provided for, belongs to the person who was the landlord at the time of accrual. When construing contracts, including the Purchase and Sale Agreement at issue in this case, courts attempt to construe contracts as a whole, to interpret their separate provisions harmoniously, so that, if possible, all of them may be given effect. When considered as a whole, the purchase and sale agreement provided that the landlord retained the right to pursue the lawsuit for unpaid rent prior to the sale of the property.

LEGAL IMPOSSIBILITY FRUSTRATION OF PURPOSE - COMMERCIAL LEASE - COVID-19 PANDEMIC - EXECUTIVE ORDERS LIMITING BUSINESS OPERATIONS - BREACH OF LEASE - TENANTS' FAILURE TO PERFORM

The determination of whether performance under a commercial lease was rendered legally impossible by the COVID-19 emergency and associated shutdowns of businesses is fact specific and dependent upon expressly what is permitted by the terms of the lease. The evidence was insufficient to establish the defenses of frustration of purpose or legal impossibility when a lease did not restrict the tenant's use of the premises to a particular purpose, the tenant was forced to close its in-person operations for approximately three months, which was a relatively short time compared to the overall lease term, and, after the relevant executive orders were modified and ultimately lifted, the tenant was entitled to resume its regular operations at the premises.

COVID-19 PANDEMIC – FORCE MAJEURE CLAUSE – APPORTIONMENT OF RISK

When a lease apportioned the risk of a business disruption such as that caused by the COVID-19 pandemic to the tenant via a *force majeure* clause, the tenant's non-payment of rent was not excused. When parties have allocated the risk of an unforeseen event, extra-contractual defenses do not displace the allocation of risk set forth in the contract.

BREACH OF LEASE – EXCLUSIVE USE RIGHTS OR RESTRICTIONS ON USE – PEACEFUL AND QUIET POSSESSION – CASUALTY

The landlord did not breach the provision of the lease that gave the tenant the right to use the premises "for the operation of a health club and fitness facility" and provided that "operation of business from the Premises for [the tenant's] Primary Uses . . . does not and will not violate any agreements respecting exclusive use rights or restrictions on use within

the Project or any portion thereof," because the executive orders issued during the early days of the COVID-19 pandemic were the cause of the temporary closure of the tenant's business – not any action taken by the landlord. The provision of the lease regarding peaceful and quiet possession addressed the landlord's good title to the premises, and no evidence was offered to establish that the landlord did not have good title to the premises. The COVID-19 pandemic was not a "casualty" allowing for abatement of rent.

Circuit Court for Anne Arundel County
Case No. C-02-CV-20-001258

IN THE APPELLATE COURT

OF MARYLAND

No. 1982

September Term, 2022
_____

SVAP II PASADENA CROSSROADS LLC

v.

FITNESS INTERNATIONAL LLC
_____

Berger,
Shaw,
Eyler, James R.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Berger, J.
_____

Filed: December 21, 2023

This case involves a dispute between a commercial landlord and tenant regarding the tenant's obligation to pay rent during the initial phase of the COVID-19 pandemic when executive orders significantly limited business operations throughout the State of Maryland. Commercial tenant Fitness International LLC d/b/a L.A. Fitness ("LAF"), appellee, refused to pay rent to SVAP II Pasadena Crossroads, LLC ("Landlord"), appellant, from April through June 2020, asserting that payment of rent was excused in light of the executive orders issued by Maryland Governor Larry Hogan. Landlord filed a claim in the circuit court seeking unpaid rent and attorney's fees. LAF filed a response as well as a counterclaim, presenting claims of breach of contract, breach of the covenant of good faith and fair dealing, declaratory judgment, specific performance, and promissory estoppel.

A bench trial was held in the Circuit Court for Anne Arundel County, after which both parties submitted post-trial memoranda. The circuit court subsequently entered judgment in favor of LAF and against Landlord, awarding LAF damages in the amount of $34,529.98, plus costs. In this timely appeal, Landlord presents the following two issues for our consideration:

> I. Whether the circuit court erred in ruling that Landlord did not satisfy its burden of proof to establish [LAF]'s breach of contract in light of the uncontroverted evidence at trial.

> II. Whether the circuit court erred in determining that LAF met its burden on its counterclaim despite LAF's failure to offer any supporting admissible evidence.

For the reasons explained herein, we shall reverse the judgment of the circuit court and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEEDINGS

The relevant facts are not disputed by the parties. In May 2009, Landlord was the owner of a building known as the Pasadena Crossroads Shopping Center located at 8070 Governor Ritchie Highway in Pasadena, Maryland, near the corner of Governor Ritchie Highway and Jumpers Hole Road (the "Property"). On May 26, 2009, Landlord and LAF entered into a lease (the "Lease") pursuant to which LAF leased approximately 40,000 square feet of commercial space (the "Premises") located within the Property.[1] LAF utilized the Premises for the operation of a fitness facility, typically referred to as L.A. Fitness.

Pursuant to the Lease, LAF was required to pay Minimum Rent, which was calculated as a variable formula based on the Consumer Price Index. At the time relevant to this appeal, the Minimum Rent was $68,757.59 per month. LAF was also required to pay Additional Rent, which included charges for real estate taxes, common area expenses, and garbage removal. Pursuant to the Lease, LAF was required to pay Minimum Rent and Additional Rent by the fifth day of each calendar month. The Lease provided that if rent is not paid by the fifth of each month, LAF is subject to late charges and interest. The Lease further provided that the prevailing party would be awarded attorney's fees if either

---

[1] The lease was amended on October 31, 2012. We shall collectively refer to the May 26, 2009 lease and the October 31, 2012 amendment as the "Lease."

2

party had to "institute any action or proceeding against the other party relating to [the] Lease."

The Lease also contained a force majeure provision, which provided, in relevant part:

> If either party is delayed or hindered in or prevented from the performance of any act required hereunder because of . . . **restrictive laws** . . . **or other reason of a similar or dissimilar nature beyond the reasonable control of the party** delayed, financial ability excepted (any "Force Majeure Event"), subject to any limitations expressly set forth elsewhere in this Lease, performance of such act shall be excused for the period of the Force Majeure Event and the period for the performance of such act shall be extended for an equivalent period (including delays caused by damage and destruction caused by such Force Majeure Event). Delays or failures to perform resulting from lack of funds or which can be cured by the payment of money shall not be Force Majeure Events. **Following the Rent Commencement Date, in no event (except as otherwise provided in this Lease) shall Tenant's obligation to pay Minimum Rent or Additional Rent pursuant to the terms and provisions of this Lease be excused by a Force Majeure Event.**

(Emphasis supplied.)

On March 5, 2020, as COVID-19 began to spread throughout the United States, Governor Larry Hogan declared a "State of Emergency and Existence of Catastrophic Health Emergency" in the State of Maryland. On March 16, 2020, the Governor issued an executive order ordering the closure of all fitness centers to the general public. On April 3, 2020, the Governor issued an order prohibiting residential and commercial evictions. Commercial tenants were, however, still required to pay rent, as the executive order provided that "[n]o provision of this Order shall be construed as relieving any person or

3

entity of any obligation to make payments or to comply with any other obligation that such person or entity may have pursuant to a note, loan agreement, or lease."

On March 17, 2020, LAF wrote to Landlord stating that Governor Hogan's March 16, 2020 order had "forced" LAF "to close" its fitness center. LAF asserted that the executive order "both frustrated the purpose of the Lease by robbing [LAF] of [its] essential benefit of the bargain under the Lease" and "constituted a force majeure event and has made performance under the Lease both impossible and impracticable . . . allowing us to fully abate rent[.]" LAF was permitted to reopen its fitness facility on June 19, 2020, albeit with certain restrictions, including a limit on occupancy. LAF resumed payment of rent in July 2020.[2]

On April 13, 2020, LAF was served with a ten-day notice of default demanding payment of the past due rent, but LAF did not remit payment. Thereafter, LAF did not pay rent for April, May, and June of 2020, nor did LAF pay associated late fees and interest.

---

[2] Apparently, LAF took the same approach at many of its locations throughout the country, which has resulted in litigation in various state and federal courts regarding similar or identical issues. The majority of jurisdictions have rejected LAF's assertions that non-payment of rent should be excused during periods of time when fitness centers were closed pursuant to government closure orders resulting from the COVID-19 pandemic. *See, e.g., Fitness Int'l, LLC v. Nat'l Retail Prop., LP*, 524 P.3d 1057, 1066 (Wash. Ct. App. 2023) (affirming trial court's grant of summary judgment to landlord rejecting LAF's equitable defenses of frustration of purpose and impossibility or impracticability); *VEREIT Real Estate, LP v. Fitness Int'l, LLC*, 529 P.3d 83, 86 (Ariz. Ct. App. 2023) (holding that landlord was entitled to summary judgment and LAF was not excused from making rent and other payments during COVID-19-related closures and rejected LAF's contractual and extra-contractual defenses); *SVAP III Poway Crossing, LLC v. Fitness Int'l, LLC*, 303 Cal. Rptr. 3d 863, 897 (Cal. Ct. App. 2023) (holding that the landlord was entitled to summary judgment against LAF because "neither the terms of the lease nor the equitable doctrines invoked by [LAF] afford it the requested relief").

Landlord asserts that the total amount owed for the relevant time period is $206,644.45, plus late fees, interest, and attorney's fees.

On May 26, 2020, Landlord filed a claim in the Circuit Court for Anne Arundel County seeking unpaid rent and attorney's fees; LAF filed a response as well as a counterclaim, presenting claims of breach of contract, breach of the covenant of good faith and fair dealing, declaratory judgment, specific performance, and promissory estoppel.

On October 22, 2021, Landlord sold the Property to Paramount Realty NJ LLC ("Paramount"). The Purchase and Sale Agreement ("PSA") pursuant to which the Property was sold included the following provision regarding Landlord's retention of rights to rent due from tenants prior to the sale of the Property in Section 7.3.1(a):

> All rentals and other tenant charges and Additional Rents . . . under the Leases received by Purchaser or Seller from any Tenant after the Proration Date shall not be prorated on the Closing Date and shall be applied as follows: . . . (ii) third, **on account of Seller for any amount then currently due Seller from such tenant for any periods before the Proration Date**[.]

(Emphasis supplied.)[3]  Section 7.3.1(c) provides that rent received by either Landlord or Paramount shall be apportioned to whichever party was entitled to the rent for the relevant time period: to Landlord for the time period before the Proration date, and to Paramount for rent for the time period after the Proration date. If Landlord received payment for rent owed to Paramount, Landlord was required to, in turn, give the rent to Paramount. If

---

[3] The PSA referred to Paramount as "Purchaser" and Landlord as "Seller." The "Proration Date" is the date upon which the sale of the Property closed.

Paramount received payment for rent owed to Landlord, Paramount was required to give the rent to Landlord.

Section 7.3.1(f) of the PSA addressed the collection of rents due under leases that were assigned to Paramount from Landlord pursuant to the PSA:

> (f) <u>Collection.</u> After Closing, Purchaser [i.e., Paramount] shall (i) bill each tenant under the Leases for all rentals and other tenant charges and Additional Rents, (ii) include all delinquent amounts in its normal billings, (iii) pursue the collection of all amounts using reasonable and customary measures, and (iv) reasonably cooperate with Seller [i.e., Plaintiff] in collecting any amounts due Seller (but shall not be required to litigate or declare a default under the applicable Lease). Delinquent payments, if any when collected by Purchaser, shall be paid to Seller to the extent of Seller's interest therein, and if not collected despite Purchaser's efforts as set forth in the preceding sentence, **Seller may not collect those payments, nor pursue an action against any tenant owing delinquent rents or any other amounts to Seller attributable to the period before the Proration Date**.

(Emphasis supplied.)

The PSA further included a provision specifically referencing ongoing litigation with LAF in Section 5.9 of the PSA:

> 5.9 <u>LA Fitness Litigation.</u> Seller agrees to indemnify, defend and hold Purchaser harmless from and against any claims, costs and expenses (including without limitation, reasonable attorneys' fees and expenses), damages, demands, losses, suits, actions, judgments or liabilities incurred by Purchaser relating to, or in connection with the LA Fitness Litigation, including, without limitation, any termination of, or loss or liability arising under, the LA Fitness Lease. Seller shall not have any obligation to settle the LA Fitness Litigation; however, any settlement shall require the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed. The provisions of this Section 5.9 shall survive Closing.

6

The PSA included certain attachments, including Exhibit H, Seller's Disclosure Statement, which specifically disclosed the ongoing LA Fitness litigation. Landlord disclosed that it "commenced an action against [LAF] for breach of contract on account of [LAF]'s failure to pay Minimum Rent and Additional Rent for the period of April 2020 through June 2020, together with all rent due through the date of judgment and attorneys' fees." The disclosure further set forth additional details regarding the basis of the litigation and the procedural posture at the time of the sale, including that the matter was scheduled to proceed to trial on February 16, 2022.

In connection with the sale of the Property, Landlord and Paramount entered into an Assignment and Assumption of Leases (the "Assignment"). The Assignment provides that Paramount "assume[d] and accept[ed] the assignment and delegation of all of [Landlord]'s right, title, and interest in and to any obligations under the leases . . . and the security deposits held by [Landlord] relating to the [Property]." The Assignment further provides Landlord "has executed this Assignment and has granted transferred and assigned the Assigned Property" -- (i.e., the leases for the Property) -- "and Assignee has accepted this Assignment and purchased the Assigned Property . . . **EXCEPT AS EXPRESSLY PROVIDED IN THE PURCHASE AND SALE AGREEMENT AND ANY OTHER DOCUMENT DELIVERED BY ASSIGNOR TO ASSIGNEE RELATED TO THE CONVEYANCE OF THE ASSIGNED PROPERTY**[.]" (Emphasis in original.)

On January 24, 2022, Landlord filed a motion for summary judgment, and, on February 8, 2022, LAF filed an opposition as well as a cross-motion for summary

judgment. Landlord filed a timely opposition to LAF's cross-motion. The circuit court denied both motions on April 1, 2022.

A bench trial was held in the circuit court on August 3, 2022. Landlord introduced multiple exhibits and presented testimony from one witness, Craig Mueller, a representative of Sterling Retail Services, Landlord's property manager. LAF introduced various executive orders issued by Governor Hogan during the COVID-19 emergency but did not offer any other evidence or call any witnesses. Both parties were given the opportunity to, and did, submit post-trial memoranda.

On January 4, 2023, the circuit court issued an order providing that "[f]or the reasons set forth in the Memorandum filed by [LAF], this [c]ourt concludes that [Landlord] has failed to meet its burden of proof as to the claim for breach of contract. [LAF] has met its burden as to the counterclaim."[4] The circuit court entered judgment in favor of LAF and against Landlord for Landlord's breach of contract claim and in favor of LAF and against Landlord with respect to LAF's counterclaim, awarding damages to LAF in the amount of $35,529.98 plus costs. This timely appeal followed.

Additional facts shall be set forth as necessitated by our consideration of the issues on appeal.

---

[4] The opinion issued by the circuit court did not specify whether its ruling was based on Landlord's lack of standing to assert the breach of contract claim or whether the ruling was based upon the merits of the breach of contract claim itself.

**STANDARD OF REVIEW**

Appellate review of a bench trial is governed by Rule 8-131(c), which provides:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witness.

The clearly erroneous standard does not apply, however, when we are reviewing the circuit court's legal conclusions. *Turner v. Bouchard*, 202 Md. App. 428 (2011). We "accord no deference" to the circuit court's legal conclusions but instead our review is for legal correctness. *Id.* (quoting *Cattail Assocs., Inc. v. Sass*, 170 Md. App. 474, 486 (2006)). When evaluating whether a circuit court's decision was legally correct, "we give no deference to the trial court findings and review the decision under a *de novo* standard of review." *Lamson v. Montgomery Cnty.*, 460 Md. 349, 360 (2018).

**DISCUSSION**

**I.**

The first issue before us on appeal is whether the circuit court erred by finding that Landlord failed to meet its burden of proof with respect to the breach of contract claim. Landlord asserts that the evidence unequivocally established the breach of contract claim. LAF contends that Landlord failed to establish standing to assert the breach of contract claim. LAF further contends that Landlord did not establish a breach of contract because Landlord did not demonstrate a breach and did not establish damages. As we shall explain, we agree with Landlord.

*A.*     *Standing*

As we discussed *supra*, Landlord sold the Property to Paramount on October 22, 2021, after the events giving rise to this appeal.  LAF asserts that, to the extent that the trial court's determination that Landlord "failed to meet its burden of proof as to the claim for breach of contract" was based on Landlord's lack of standing to assert that claim, that decision is correct and should be affirmed.  LAF maintains that when Landlord sold the Property, it gave up any rights to pursue unpaid rent arising from the Lease.  We disagree.

First, we observe that it is undisputed that LAF entered into a commercial lease with Landlord pursuant to which LAF agreed to pay monthly rent to Landlord.  There is no provision in the Lease that relieves LAF of its obligation to pay rent upon assignment. Under Maryland law, "[w]hen there is a transfer of title, unpaid accrued rent, unless otherwise provided for, belongs to the person who was the landlord at the time of accrual." *Antietam-Sharpsburg Museum, Inc. v. William H. Marsh, Inc.*, 252 Md. 265, 267 (1969).

Furthermore, the PSA and Assignment associated with the sale of the Property from Landlord to Paramount, both of which were admitted at trial, establish that Landlord retained the right to collect the unpaid rent at issue.  As we set forth *supra*, Section 7.3.1(a) of the PSA provided the manner in which rent and tenant charges would be apportioned after the Proration Date, providing that Landlord was entitled to "any amount then currently due Seller from such tenant **for any periods before the Proration Date**."  (Emphasis supplied.)  Section 7.3.1(c) confirmed that either Landlord or Paramount could receive rent from a tenant, but that if Paramount received rent for a time period preceding the Proration

10

Date, the rent must be given to Landlord. The time period relevant to this appeal -- March through June of 2020 -- was before the Proration Date of October 22, 2021.

Notably, the PSA also had a separate provision specifically addressing the ongoing litigation with LAF. Section 5.9 provides that "Seller agrees to indemnify, defend and hold Purchaser harmless from and against any claims, costs and expenses (including without limitation, reasonable attorneys' fees and expenses), damages, demands, losses, suits, actions, judgments or liabilities incurred by Purchaser relating to, or in connection with the LA Fitness Litigation." Pursuant to this section of the PSA, Landlord did "not have any obligation to settle the LA Fitness Litigation," although "any settlement shall require the prior written consent of [Paramount], which consent shall not be unreasonably withheld, conditioned or delayed." This provision reflects that Landlord and Paramount anticipated the ongoing litigation between Landlord and LAF regarding unpaid rent during the 2020 COVID-19 emergency to continue after the sale of the Property. Indeed, the final sentence of the section specifically provided that "[t]he provisions of this Section 5.9 **shall survive closing**." (Emphasis supplied.)

In addition, Section 6.1.2 of the PSA provided that "Section 5.9 shall expire thirty (30) days after the later to occur of (1) a settlement is entered, with prejudice, with respect to the LA Fitness Litigation, and (2) a final and unappealable judgment is issued with respect to the LA Fitness Litigation." Furthermore, Exhibit H, Seller's Disclosure Statement, specifically disclosed the ongoing LA Fitness litigation and set forth details regarding the basis of the litigation and the procedural posture at the time of the sale. Although Landlord generally assigned all of Landlord's "right, title, and interest in and to

11

any obligations under the leases" to Paramount, the Assignment expressly provided that Paramount "ha[d] accepted this Assignment and purchased the Assigned Property . . . EXCEPT AS EXPRESSLY PROVIDED IN THE PURCHASE AND SALE AGREEMENT AND ANY OTHER DOCUMENT DELIVERED BY ASSIGNOR TO ASSIGNEE RELATED TO THE CONVEYANCE OF THE ASSIGNED PROPERTY." (Emphasis in original.)

LAF points to Section 7.3.1(f) of the PSA in support of its assertion that the rent at issue can only be collected by Paramount. Section 7.3.1(f) addresses collection of rents under leases that were assigned to Paramount from Landlord. LAF specifically points to language providing that "[Landlord] may not collect those payments, nor pursue an action against any tenant owing delinquent rents or any other amounts to [Landlord] attributable to the period before the Proration Date." Section 7.3.1(f) referred to Paramount "bill[ing] each tenant under the Leases for all rentals and other tenant charges and Additional Rents" post-closing, including "all delinquent amounts in its normal billings." Landlord emphasizes that the language in Section 7.3.1(f) addresses the general collection of delinquent payments due before the closing date and makes no mention of the ongoing LAF litigation.

We agree with Landlord that when considering all of the provisions in the PSA, Section 7.3.1(f) refers to efforts to collect amounts due to Landlord *other* than the amount sought in this litigation. When engaging in contract interpretation, courts "attempt to construe contracts as a whole, to interpret their separate provisions harmoniously, so that, if possible, all of them may be given effect." *Walker v. Dep't of Human Res.*, 379 Md.

12

407, 421 (2004). "In interpreting a contract provision, we look to the entire language of the agreement, not merely a portion thereof." *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 448 (2008) (citing *Jones v. Hubbard*, 356 Md. 513, 534-35 (1999)). Adopting the reasoning advanced by LAF -- that Section 7.3.1(f) precludes Landlord from pursuing the very litigation specifically referenced in other contract provisions – would render those provisions regarding the LAF litigation entirely meaningless and render them nugatory. *Walker*, *supra*, 379 Md. at 420.

Furthermore, "when a general provision seemingly conflicts with a specific provision, we will give effect to the specific provision." *Pinnacle Group, LLC v. Kelly*, 235 Md. App. 436, 456 (2018). Section 7.3.1(f) refers to the collection of delinquent amounts generally but does not refer to the ongoing LAF litigation, while Sections 5.9 and 6.1.2, as well as Landlord's Disclosure Statement, specifically refer to the LAF Litigation and contain provisions regarding its ongoing status. Interpreting the PSA in a manner that forecloses the LAF litigation would defy the established rules of contract interpretation and produce an unreasonable result. For example, Section 5.9 provides that Landlord does "not have any obligation to settle the LA Fitness Litigation." If Landlord were prohibited from pursuing the LAF Litigation altogether, this provision would be rendered meaningless. For these reasons, we reject LAF's contention that Landlord lacks standing to pursue the instant litigation.[5]

---

[5] LAF cites the case of *Neese v. Johanns*, 518 F.3d 215, 219 (4th Cir. 2008), in support of its standing argument. In *Neese*, the United States Court of Appeals for the Fourth Circuit held that the parties lacked standing to bring a breach of contract claim when

### B. *Landlord's Breach of Contract Claim*

Landlord asserts that the circuit court erred in ruling in favor of LAF as to Landlord's breach of contract claim because the evidence conclusively established that LAF breached the terms of the Lease when LAF failed to pay rent required by the Lease from April through June of 2020. As we shall explain, we agree with Landlord.

Landlord established a *prima facie* claim for breach of contract at trial, when it presented evidence demonstrating that: (1) Landlord and LAF were parties to the Lease; (2) the Lease obligated LAF to pay rent each month; and (3) LAF failed to pay rent to Landlord from March 2020 through June 2020. LAF does not dispute that it failed to pay rent to Landlord pursuant to the lease. Indeed, LAF admits that it intentionally did not pay rent, arguing that executive orders issued by Governor Hogan excused its obligation to pay rent as required by the Lease.[6]

In light of our determination that Landlord established a *prima facie* breach of contract claim, we turn to the defenses of frustration of purpose and legal impossibility raised by LAF. As we observed in *Critzos v. Marquis*, 256 Md. App. 684, 692 n.3 (2023), "[t]he cases addressing the defenses of frustration of purpose and legal impossibility do not always clearly delineate between the two." We explained:

---

they "transferred all their rights under those contracts to third parties" and therefore "have no rights left to invoke." *Id.* In *Neese*, the parties entered into separate contracts "without reservation." *Id.* In contrast, the PSA at issue in this case contains no similar language.

[6] On appeal, LAF asserts that Landlord did not establish that LAF owed past-due rent under the Lease because its witness did not specifically testify otherwise. Critically, LAF admitted that it did not pay rent under the Lease.

Indeed, they are very similar and related defenses. Frustration of purpose applies "where the purpose of a contract is completely frustrated and rendered impossible of performance by a supervening event or circumstance," and legal impossibility applies when, by no fault of the promisor, the "law itself subsequently forbids or prevents the performance of the promise." *Harford Cnty*. [*v. Town of Bel Air*], 348 Md. [363,] 384-85, 704 A.2d 421 [(1998)] (quotations and citations omitted). In this case, where the supervening event at issue is the COVID-19 pandemic and associated executive orders prohibiting businesses from operating as usual, the two defenses are inextricably linked and lend themselves to the same analysis, i.e., whether the [supervening event of the] COVID-19 [pandemic and associated] executive orders rendered the [the tenant's] performance under the terms of the lease legally impossible to perform.

*Id.* Specifically, we consider LAF's claim that the executive orders issued by Governor Hogan during the early days of the COVID-19 emergency relieved LAF's obligation to pay rent under the Lease.

Both parties rely significantly on our recent decision in *Critzos*, *supra*, 256 Md. App. 684, when addressing whether the COVID-19-related-closure orders excused LAF's obligation to pay rent. In *Critzos*, the only reported Maryland case to date addressing this issue, we addressed whether the COVID-19 pandemic and associated executive orders limiting business operations throughout the State of Maryland rendered performance under a commercial lease for a brewery/pub legally impossible or so frustrated the purpose of the contract as to excuse the tenant's performance. The trial court in *Critzos* found in the tenants' favor, determining that the tenants' obligations under the lease were excused by the legal doctrines of frustration of purpose and legal impossibility. *Id.* at 690-91. The

15

commercial landlord appealed, and we reversed, holding that the tenants' obligations were not excused. *Id.* at 700-01.

After reviewing out-of-state cases from various jurisdictions that addressed commercial tenants' obligations to pay rent during periods of business closures due to COVID-19, we determined "the focus necessarily must be upon what is expressly permitted by the terms of the lease." *Id.* at 698. We observed that a "Massachusetts trial court . . . found that executive orders closing Massachusetts businesses frustrated the purpose of a commercial lease when a lease specifically limited the use of the premises 'solely' for 'the operation of a Caffé Nero themed café under Tenant's Trade Name and for no other purpose[.]'" *Id.* (quoting *UMNV 205-207 Newbury LLC v. Caffé Nero Americas, Inc.*, No. 2084CV01493-BLS2, 2021 WL 956069, at *2.5 (Mass. Super. Ct. Feb. 8, 2021)).

Critically, the Massachusetts Appeals Court expressly declined to adopt the reasoning of *Caffé Nero* in the case of *Inland Com. Real Est. Servs., LLC v. ASA EWC, LLC*, 213 N.E.3d 604, 608 n.2 (Mass. App. Ct. 2023) ("EWC heavily relies on a Superior Court judge's contrary decision in *UMNV 205-207 Newbury, LLC vs. Caffé Nero Ams., Inc.*, Mass. Sup. Ct., No. 2084CV01493-BLS2, 2021 WL 956069 (Suffolk County Feb. 8, 2021), but that decision is not binding precedent."). The Massachusetts Appeals Court further noted that "[i]n the context of the COVID-19 pandemic, the vast majority of courts to have considered frustration of purpose have declined to apply the doctrine to temporary business closures caused by government shutdown orders." *Id.* at 608. This conclusion

16

was based on a review of cases from several jurisdictions, including our own decision in *Critzos*, *supra*. The Massachusetts Appeals Court observed:

> In reaching that result [that nonpayment of commercial rent due to COVID-19-related closures was not excused], courts have looked to the duration of the closure, the length of the lease, how far into the lease term the closure occurred, and whether the tenant could have reopened its business once the COVID-19 restrictions were lifted. *See 9795 Perry Highway Mgt., LLC v. Bernard*, 273 A.3d 1098, 1106-1107 (Pa. Super. 2022) (no substantial frustration where closure was "relatively short-term," occurred more than two years into lease, and tenants "could have reopened, albeit at a reduced capacity," in June 2020 had they not vacated). Also relevant is whether the tenant remained in possession of the premises during the closure period, see *SVAP III Poway Crossings, LLC* [*v. Fitness Int'l, LLC*, 87 Cal. App. 5th 882, 891-92, 303, Cal. Rptr. 3d 863 (2023)]; *Fitness Int'l, LLC v. National Retail Props., LP*, 25 Wash. App. 2d 606, 524 P.3d 1057, 1065 (2023), and whether the tenant could have used the premises for business uses not barred by the shutdown orders, *see AGW Sono Partners, LLC v. Downtown Soho, LLC*, 343 Conn. 309, 336, 273 A.3d 186 (2022) (lease terms, which allowed takeout and outdoor dining, did not "render the lease agreement valueless in light of the executive orders" barring indoor dining); *Critzos*, *supra* at 699, 287 A.3d 1281 (similar); *Fitness Int'l, LLC*, *supra* at 1064 ("In leasing, the frustration defense is unavailable if a lease allows the tenant to put the premises to another use").

*Inland Com. Real Est. Servs.*, *supra*, 213 N.E.3d at 608.

The Massachusetts Appeals Court held in favor of the commercial landlord and against the commercial tenant, reasoning that the tenant "has not shown that the temporary closure caused by the pandemic substantially frustrated the principal purpose of the lease." *Id*. The court emphasized the fact that the tenant "was forced to close its in-person operations for three months, a relatively short time compared to the overall lease term,

17

during which it remained in possession of the premises and had the ability to sell some goods." *Id.* The court held that "[b]ecause the closure was temporary and occurred well into the lease term, and [tenant] was able to resume operations soon after, [tenant] has not established that the purpose of the lease was so frustrated."

The Massachusetts Appeals Court further rejected the tenant's "temporary" frustration of purpose argument, emphasizing that frustration of purpose applies only when the value of a contract has been totally or substantially destroyed. *Id.* at 609. Because the tenant "continued to operate its business at the premises once the COVID-19 restrictions were lifted and then challenged Inland's claim for possession," the court concluded that "the purpose of the lease was not destroyed." We are persuaded by the reasoning and the analytical path of the Massachusetts Appeals Courts in *Inland Commercial*. Further, we find it notable that the Appeals Court declined to follow the reasoning of the Massachusetts trial court in *Caffé Nero*.

Other out-of-state cases we considered in *Critzos* reached the same conclusion as the conclusion reached by the Massachusetts Appeals Court in *Inland Commercial*. For example, we considered the case of *Firestone Fin., LLC v. WA Gym Naperville N., LLC*, No. 21 C 1183, 2022 WL 4094161, at *7 (N.D. Ill. Sept. 7, 2022), in which the United States District Court for the Northern District of Illinois found that a frustration of purpose defense failed as a matter of law when commercial fitness centers stopped making payments on commercial loans used to finance their gym equipment during

18

COVID-19-related shutdowns.[7]  After considering the above-cited cases, we observed "that the focus necessarily must be upon what is expressly permitted by the terms of the lease." *Critzos*, *supra*, 256 Md. App. at 698.

Landlord emphasizes that the Lease did not limit LAF to using the premises only as a fitness center but instead permitted LAF to use the Premises for any "retail or commercial use of the type typically found in a retail shopping center."[8]  Landlord further observes that the Lease expressly permits LAF to operate a "juice bar" and "food and beverage service." Landlord also posits that during the COVID-19 shutdowns, LAF could have used the space to promote at-home workouts via the internet.[9]  LAF asserts that Landlord's observations regarding other permissible uses for the Premises are "Monday-morning quarterback suggestions."  We disagree.  The relevant inquiry is not whether LAF should have used the

---

[7] We also considered the case of *AGW Sono Partners, LLC v. Downtown Soho, LLC*, 343 Conn. 309 (2022), which is discussed *supra* in the block quotation from *Inland Com. Real Est. Servs.*, *supra*, 213 N.E.3d at 608, on page 16 of this opinion.

[8] The Lease contained a Required Operation Period, which required the property to be used as a fitness center for one day.  For the balance of the Lease, the use options were much broader.

[9] Landlord directs our attention to our unreported opinion in *Shri Sai, LLC v. Cascade Montpelier, LLC*, No. 229, Sept. Term 2021, 2022 WL 2981493 (Md. Ct. Spec. App. July 28, 2022), in which we addressed whether a restaurant operator was liable for rent during COVID-19-related shutdowns even when the lease strictly limited the tenant's use of the property, providing that "such occupancy shall be for the sole and exclusive purpose of a coffee house, Indian restaurant, and for no other purpose whatsoever." *Id.* at *1.  Pursuant to Maryland Rule 1-104, unreported opinions of Maryland appellate courts may not be cited as precedent or within the rule of stare decisis, but may be cited as persuasive authority only if issued on or after July 1, 2023.  Because our opinion in *Shri Sai* was issued prior to this date, we shall not consider it in this appeal.

Premises for an alternate use, but whether LAF would have been permitted to do so under the express terms of the lease. *See Critzos*, *supra*, 256 Md. App. at 698.

In our view, the evidence presented to the circuit court was insufficient to establish the defenses of frustration of purpose or legal impossibility. The Lease terms did not restrict LAF's use of the Premises to a particular purpose. Moreover, LAF was forced to close its in-person operations for approximately three months, which was a relatively short time compared to the overall lease term. *See Inland Com. Real Est. Servs.*, *supra*, 213 N.E.3d at 608. After the relevant executive orders were modified and ultimately lifted, LAF was entitled to resume its regular operations at the Premises.

Furthermore, in the Lease at issue in this case, unlike in *Critzos*, the parties specifically allocated the risk of an unforeseen event, providing that "[i]f either party is delayed or hindered in or prevented from the performance of any act required hereunder because of . . . restrictive laws . . . or other reason of a similar or dissimilar nature beyond the reasonable control of the party . . . in no event (except as otherwise provided in this Lease) shall Tenant's obligation to pay Minimum Rent or Additional Rent pursuant to the terms and provisions of this Lease be excused by a Force Majeure Event." [10] When parties have allocated the risk of an unforeseen event, extra-contractual defenses do not displace the allocation of risk set forth in the contract. "Contracts play a critical role in allocating the risks and benefits of our economy, and courts generally should not disturb an

---

[10] In *Critzos*, we observed that "[p]erhaps a *force majeure* clause would have more clearly delineated the options available to the landlord or tenant under these circumstances and apportioned the risk of such an event as desired by the negotiating parties." 256 Md. App. at 700.

unambiguous allocation of those risks in order to avoid adverse consequences for one party." *Calomiris v. Woods*, 353 Md. 425, 445 (1999). LAF bore the risk that it could not operate as a fitness center by the terms of the *force majeure* clause in this Lease. Accordingly, LAF's extra-contractual defenses fail as a matter of law.

Because the Lease apportioned the risk of such an event to LAF via the *force majeure* clause, and because LAF's extra-contractual defenses of impossibility and frustration of purpose fail as a matter of law, we hold that the circuit court erred by entering judgment in favor of LAF. The uncontroverted evidence established that LAF breached the Lease by failing to pay rent as required during the months of April through June of 2020, and no reasonable fact-finder could conclude otherwise. Accordingly, we shall reverse.

## II.

We next turn our attention to Landlord's assertion that the circuit court erred by entering judgment in LAF's favor with regard to the counterclaim. Landlord contends that the circuit court erred in determining that Landlord breached the Lease and that LAF was entitled to a rent abatement during the period of time during the COVID-19 shutdown.[11]

---

[11] LAF asserted five grounds for its counterclaim before the circuit court: breach of contract, breach of the covenant of good faith and fair dealing, declaratory judgment, specific performance, and promissory estoppel. In its post-trial memorandum, LAF asserted only two grounds: (1) breach of lease, and (2) that LAF was entitled to a rent abatement. In its order granting judgment in favor of LAF as to the counterclaim, the circuit court adopted the reasoning set forth in LAF's post-trial memorandum. On appeal to this Court, both parties address only the breach of Lease and rent abatement issues and not the other grounds initially raised by LAF.

21

Landlord contends that LAF failed to present sufficient evidence to support its rent abatement request or to establish a breach of lease.

LAF asserts that Landlord breached at least two provisions of the Lease. Specifically, LAF points to Section 1.9, which gave LAF the right to use the Premises "for the operation of a health club and fitness facility" and provided that "operation of business from the Premises for [LAF's] Primary Uses . . . does not and will not violate any agreements respecting exclusive use rights or restrictions on use within the Project or any portion thereof." LAF points to the testimony of Landlord's witness during cross-examination that LAF was "not able to" use the Premises "as a fitness center" as evidence that Section 1.9 of the Lease was breached by Landlord.

We are not persuaded by LAF's contention. The executive orders issued during the early days of the COVID-19 pandemic were the cause of the temporary closure of LAF's business -- not any action taken by Landlord. Furthermore, the Lease permits LAF to operate a fitness center. It does not require LAF to operate a fitness center. The reference in Section 1.9 to "agreements respecting exclusive use rights or restrictions" cannot be reasonably interpreted as implicating emergency action taken by the Governor. To the extent that the circuit court's entry of judgment in favor of LAF as to the counterclaim was premised upon a breach of Section 1.9 of the Lease, we hold that there was insufficient evidence presented at trial to establish such a claim.

LAF also directs our attention to Section 2.2 of the Lease, in which Landlord represented that the Landlord would own the Premises during the term of the Lease "free and clear of all . . . covenants, conditions, [and] restrictions . . . which might in any manner

22

or to any extent prevent or adversely affect the use of the Premises by [LAF] for [LAF's] intended purposes, or disturb [LAF's] peaceful and quiet possession and enjoyment thereof." LAF asserts that the evidence established that its "peaceful and quiet enjoyment of the" Premises was adversely affected when LAF was unable to use the Premises to operate its fitness center. We agree with Landlord that Section 2.2 is inapplicable because it addresses Landlord's "good and insurable title to the Project and the Premises." No evidence was offered to establish that Landlord did not have good title to the Premises. Accordingly, we hold that to the extent that the circuit court's entry of judgment in favor of LAF as to the counterclaim was premised upon a breach of Section 2.2 of the Lease, we hold that there was insufficient evidence presented at trial to establish such a claim.

Landlord further contends that LAF's request for rent abatement based upon the terms of the Lease must fail. LAF points to Section 15.4 of the Lease in support of its rent abatement argument, which provides that rent shall be "equitably abated from the date of [a] casualty based upon the extent of the interference resulting from such casualty (or shall be fully abated for such period if the operation of [LAF]'s business from the remaining portion of the Premises is not reasonably practicable)." LAF does not assert that the COVID-19-related executive orders constituted a casualty, but, rather, that the COVID-19 coronavirus itself constituted a casualty entitling LAF to rent abatement. We have consistently held that the COVID-19 pandemic and associated executive orders did not constitute a "casualty" because they "did not create a direct physical loss of property or direct physical damage to it." *GPL Enter., LLC v. Certain Underwriters at Lloyd's*, 254 Md. App. 638, 654, *cert. denied*, 482 Md. 538 (2023) (internal quotation and citation

23

omitted). We hold the same reasoning applies in this case. Accordingly, we hold that LAF did not present sufficient evidence to support its rent abatement claim.

Based upon our review of the uncontroverted evidence presented at trial, we hold that the circuit court erred in ruling that Landlord did not satisfy its burden of proof to establish LAF's breach of contract claim. We further hold that the circuit court erred in determining that LAF satisfied its burden of proof to establish its counterclaim. We shall remand to the circuit court for the issuance of an order entering judgment in favor of Landlord as to both Landlord's breach of contract claim and LAF's counterclaim, as well as for the determination of damages. We further direct that the circuit court issue a written order declaring the rights and obligations of the parties consistent with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED. ORDER GRANTING JUDGMENT IN FAVOR OF APPELLEE FITNESS INERNATIONAL LLC VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION AND FOR ISSUANCE OF A WRITTEN ORDER DECLARING THE RIGHTS AND OBLIGATIONS OF THE PARTIES. COSTS TO BE PAID BY APPELLEE.**